# EXHIBIT A

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

STATE OF SOUTH CAROLINA )    IN THE COURT OF COMMON PLEAS
                        )    THIRTEENTH JUDICIAL CIRCUIT
COUNTY OF GREENVILLE    )

ScanSource, Inc.,                       )        Civil Action No.
                                        )
                           Plaintiff,   )
                                        )
            vs.                         )            **SUMMONS**
                                        )
Courier Plus, Inc. d/b/a Dutchie,       )
                                        )
                           Defendant.   )
                                        )

TO:    THE DEFENDANT ABOVE-NAMED:

        YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action, a
copy of which is hereby served upon you, and to serve a copy of your Answer to the said Complaint
upon the subscribers at 2 W. Washington Street, Suite 400, PO Box 10084 (29603), Greenville, South
Carolina 29601, within thirty (30) days after service hereof, exclusive of the day of such service, and
if you fail to answer the Complaint within the time aforesaid, judgment by default will be rendered
against you for the relief demanded in said Complaint.

                        Respectfully Submitted,

                        **NELSON MULLINS RILEY & SCARBOROUGH LLP**

                        By:/s/ Samuel W. Outten
                            Samuel W. Outten
                            SC Bar No. 4295
                            E-Mail: sam.outten@nelsonmullins.com
                            Abigail L. Wood
                            SC Bar No. 105426
                            E-Mail: abigail.wood@nelsonmullins.com
                            2 West Washington Street / Suite 400
                            Post Office Box 10084 (29603-0084)
                            Greenville, SC 29601
                            Telephone: (864) 373-2300

                        *Attorneys for ScanSource, Inc.*

Greenville, South Carolina
June 30, 2023

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

| | |
|---|---|
| STATE OF SOUTH CAROLINA | ) |
| | ) IN THE COURT OF COMMON PLEAS |
| COUNTY OF GREENVILLE | ) THIRTEENTH JUDICIAL CIRCUIT |
| | ) |
| ScanSource, Inc., | ) Civil Action No. |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) **COMPLAINT** |
| | ) |
| Courier Plus, Inc. d/b/a Dutchie, | ) **JURY TRIAL DEMANDED** |
| | ) |
| Defendant. | ) |
| | ) |

ScanSource, Inc., complaining of Courier Plus, Inc. d/b/a Dutchie, would respectfully show unto the Court as follows:

## PARTIES

1.      ScanSource, Inc. ("ScanSource") is a corporation organized under the laws of the State of South Carolina with its principal place of business at 6 Logue Court, Greenville, South Carolina 29615.

2.      Upon information and belief, Courier Plus, Inc. d/b/a Dutchie ("Dutchie") is a corporation organized under the laws of the State of Delaware with its principal place of business at 2728 NW Potts Court, Suite 100, Bend, Oregon 97703.

## JURISDICTION AND VENUE

3.      This Court has personal jurisdiction over the Parties under S.C. Code Ann. §§ 36-2-802 and 36-2-803.

4.      Venue is proper in this Court under S.C. Code Ann. § 15-7-30 and as set forth in the Customer Agreement between the parties as defined below.

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

## FACTUAL ALLEGATIONS

5.     ScanSource is a hybrid technology distributor that connects businesses with cutting-edge technology solutions from the world's leading suppliers.

6.     Upon information and belief, Dutchie provides point of sale, electronic commerce, payments, and insurance solutions for cannabis dispensaries.

7.     On September 28, 2021, Dutchie entered into an Agreement with ScanSource to purchase technology products from various suppliers ("Customer Agreement," attached as **Exhibit A**.)

8.     Under this Customer Agreement, Dutchie would send Purchase Orders ("POs") to ScanSource for various products.   ScanSource would source the requested products from the applicable vendors, ship those products to Dutchie, and invoice Dutchie for the products.   Since the execution of the Customer Agreement, Dutchie periodically ordered non-custom products under the Customer Agreement, which ScanSource invoiced to Dutchie and shipped to Dutchie's designated locations.

9.     After entering into the Customer Agreement, Dutchie discussed with ScanSource the possibility of purchasing large volumes of custom made or custom configured products from Elo Touch Solutions, Inc. ("Elo"), a technology company specializing in touchscreen displays, monitors, computers, and components.  ScanSource is a long-standing distributor of Elo products and previously entered into a Distributorship Agreement with Elo, dated March 1, 1998, as later amended ("Elo Agreement," attached as **Exhibit B**), pursuant to which Elo appointed ScanSource as a distributor of certain Elo products.  As a distributor, ScanSource has the right to submit orders for Elo products to resell under certain conditions and obligations.

10.     The Elo Agreement provides that ScanSource may cancel orders only with the prior written consent of Elo, which Elo has no obligation to do.  If Elo approves a cancellation of an

3

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

order, "all costs incurred by Elo for work performed, materials used, or products manufactured up to the time of cancellation or approval thereof by Elo, whichever is later, will be charged to ScanSource and paid by ScanSource within thirty days." Ex. B, ¶ 3.03.

11.    Specifically, Dutchie discussed purchasing two custom Elo products from ScanSource:

> (1) E375184 I-Series 4.0 Slate RK with Z30 stand, no CFD ("All in One Monitors"); and
>
> (2) E466379 1002L CFD + Wedge Stand ("Customer Displays," and together with the All in One Monitors, collectively, the "Custom Products").

12.    The Custom Products would be custom-made with the Dutchie name etched into the devices, and the All in One Monitors are also loaded with custom firmware. It is typical in the technology distribution industry for orders for custom made or custom configured products to be Non-Cancelable/Non-Returnable ("NC/NR"), which is Elo's standard practice.

13.    Upon information and belief, Dutchie discussed the NC/NR Custom Product purchases with Elo directly during this time to determine if large custom orders would be feasible.

14.    On November 18, 2021, Dutchie placed its first PO to ScanSource for 20,000 units ($12,458,333.33) of the All in One Monitors and 15,000 units ($4,500,000.00)[1] of the Customer Displays ("11/18/2021 PO," attached as **Exhibit C**). The 11/18/2021 PO states that "Dutchie branded Products will be non-cancellable."

15.    On November 30, 2021, ScanSource placed its first PO to Elo for 3,000 units ($1,875,000) of the All in One Monitors ("11/30/2021 PO").[2]

---

[1] Dutchie originally requested 10,000 units of the Customer Displays and increased the order to 15,000 on December 22, 2021.

[2] ScanSource has received some payment from Dutchie for the 11/30/2021 PO.

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

16.     After placing the 11/30/2021 PO for the All in One Monitors, ScanSource and Dutchie negotiated a First Supplement to the Customer Agreement ("Supplemental Agreement," attached as **Exhibit D**) to account for the large size of these orders and the lack of delivery schedules, and to establish that the Custom Products could neither be cancelled nor returned to Elo.

17.     On December 17, 2021, ScanSource and Dutchie signed the Supplemental Agreement, which set forth the terms and conditions for Dutchie's orders of the Custom Products. The Supplemental Agreement reflected the terms that ScanSource had with Elo, making clear that any orders of custom products were NC/NR.

18.     The Supplemental Agreement provides in part that "Dutchie warrants and represents that it understands all purchase orders under this Supplement which Dutchie submits to ScanSource shall be non-returnable, non-modifiable, and non-cancelable." Ex. D, ¶ 4.

19.     This Supplemental Agreement further provides in part that "Dutchie commits to purchase stock of all branded ELO Products that have been (i) ordered by ScanSource from ELO based on Dutchie's monthly forecasts and (ii) held in inventory by ScanSource for longer than ninety (90) days as evidenced by ScanSource's inventory reports ('Excess Inventory')." *Id.* ¶ 2.4.

20.     The monthly forecasts, as described in the Supplemental Agreement, were provided by Dutchie to ScanSource on a rolling monthly basis to set the amount and timing of ScanSource's POs to Elo for the Custom Products.

21.     The purpose of the monthly forecasts was to provide ScanSource with an estimate of the number of Custom Products Dutchie anticipated it would be able to sell on a monthly basis, to meet Dutchie's customer demands while also preventing overstock of Custom Products.

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

22.     As specified in Dutchie's 11/18/2021 PO and its monthly forecasts provided to ScanSource, ScanSource placed POs to Elo on December 21, 2021 for 10,032 units of the All in One Monitors and on January 5, 2022 for 13,000 units of the Customer Displays.

23.     Upon information and belief, Dutchie and Elo continued to have discussions about these POs, including about the number of Custom Products ordered by ScanSource.

24.     On January 26, 2022, Dutchie emailed ScanSource stating that:

> It is my understanding only 13,000 [All in One Monitors] have been placed on order through Elo. We need to have the entire volume on the PO placed to Elo immediately. Please also place the full order for the [Customer Displays]. There should be no risk to Scansource [sic] in doing this as there is an executed sell over agreement between Dutchie and Scansource [sic].

25.     Following this written directive and in accordance with the monthly forecasts, ScanSource placed an additional PO to Elo on January 27, 2022 for the remaining Custom Products in Dutchie's 11/18/2021 PO.

26.     On May 5, 2022, Dutchie sent a second PO to ScanSource for Custom Products, specifically for 1,000 units ($622,920.00) of the All in One Monitors and 1,000 units ($300,000.00) of the Customer Displays. ("5/5/2022 PO", attached as **Exhibit E**), asking ScanSource to "please process and provide order acknowledgement."

27.     In response to this 5/5/2022 PO and Dutchie's monthly forecasts, ScanSource placed a PO to Elo on May 6, 2022, for 1,000 units of the All in One Monitors and 1,000 units of the Customer Displays.

28.     On June 16, 2022, ScanSource received a third PO from Dutchie for Custom Products, specifically for 8,000 units ($5,208,320.00) of the All in One Monitors and 8,000 units ($2,400,000.00) of the Customer Displays. ("6/16/2022 PO," attached as **Exhibit F**.)

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

29.     In response to this 6/16/2022 PO and Dutchie's monthly forecasts, ScanSource placed a PO to Elo on June 22, 2022 for 8,000 units of the All in One Monitors and 8,000 units of the Customer Displays ("6/22/2022 PO").

30.     On November 10, 2022, Dutchie requested that ScanSource immediately inform Elo to take the following actions with respect to the Custom Products Dutchie had previously ordered: "(1) ELO must stop Production on all [Custom] Products for Dutchie, including work in process; (2) ELO must not begin production on any additional [Custom] Products for Dutchie; (3) ELO is not to ship any [Custom] Products for Dutchie out of Asia effective **immediately** November 10, 2022; and (4) ELO to provide a full accounting of all [Custom] Products and at what stage of production they are in as of November 10, 2022."

31.     On November 11, 2022, ScanSource informed Elo of Dutchie's request, and Elo implemented temporary holds on current and future productions beginning November 14, 2022, pending further discussions.

32.     As a result, on November 14, 2022, Elo halted the manufacture of Custom Products ordered by ScanSource for Dutchie. The Custom Products as of November 14, 2022 can be organized in four stages as set forth in the following groups.

33.     First, some of the Custom Products ordered based on Dutchie's POs had already been completed and shipped by Elo, and at that time, the Custom Products were either (1) stored by ScanSource in its warehouse pursuant to the parties' Supplemental Agreement or (2) in transit from Elo to ScanSource's warehouse. Over the next few months, after ScanSource stored these Custom Products for at least 90 days, ScanSource invoiced Dutchie under a Bill and Hold arrangement outlined in the Supplemental Agreement ("Bill and Hold Custom Products").

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

34. Under Exhibit A to the Supplemental Agreement, Dutchie and ScanSource agreed that ScanSource would store Custom Products Dutchie purchased from ScanSource in its warehouse and would invoice Dutchie for these products after ninety (90) days and provide storage and warehousing of these products until Dutchie provided a delivery location. Title and ownership of these products transferred to Dutchie at the time of invoicing. At this time, these Bill and Hold Custom Products are still being stored in ScanSource's warehouse.

35. Second, the Custom Products ordered based on Dutchie's monthly forecasts had already been completed and shipped by Elo, and at that time, were either (1) stored by ScanSource in its warehouse or (2) in transit from Elo to ScanSource's warehouse ("Forecast-Based Custom Products"). After ScanSource stored the Forecast-Based Custom Products for at least 90 days, ScanSource invoiced Dutchie under a Bill and Hold arrangement.

36. Third, Elo completed some of the Custom Products in its facility in Asia, but Elo had not shipped to ScanSource ("Elo-Held Custom Products"). The Elo-Held Custom Products have been or will be shipped to ScanSource. Under the Supplemental Agreement, after the Elo-Held Custom Products are received by ScanSource and held for 90 days, the Elo-Held Custom Products will be invoiced to Dutchie through a Bill and Hold arrangement and title will be transferred to Dutchie.

37. Fourth, the remainder of the Custom Products ordered by ScanSource for Dutchie had not yet been fully manufactured by Elo ("Unproduced Custom Products").

38. Following the initial conversation with Elo on November 11, 2022, ScanSource further requested that Elo cancel the 6/22/2022 PO for 8,000 units of the All in One Monitors and 8,000 units of the Customer Displays.

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

39.     In December 2022, Elo informed ScanSource that it had partially completed the 6/22/2022 PO and could not accept cancellations or returns of any of the Custom Products on any POs pursuant to the Elo Agreement.

40.     Instead, Elo offered to accept payment of material liability and related costs, totaling approximately $10.6 million, in exchange for cancellation of the remainder of the 6/22/2022 PO and all open POs for Unproduced Custom Products.

41.     Elo indicated that ScanSource remained responsible for the full amount of the Bill and Hold Custom Products and Elo-Held Custom Products.

42.     On January 16, 2023, ScanSource communicated to Dutchie that payment was due for the Bill and Hold Custom Products and the Elo-Held Custom Products, and explained that Dutchie would either be responsible for the full amount of the Unproduced Custom Products or could pay the material liability amount for those products.

43.     Dutchie responded on January 19, 2023, stating that Dutchie would not purchase any of the Unproduced Custom Products but was willing to work with ScanSource and Elo regarding payment for the Bill and Hold Custom Products, and was willing to cover "minimal costs" for the Elo-Held Custom Products.

44.     After receiving no payments from Dutchie on the Bill and Hold Custom Products, ScanSource followed up with Dutchie on February 2, 2023 stating that the Bill and Hold Custom Product invoices that have already been billed would be due upon receipt and would be assessed interest at a rate of 12% annually beginning February 1, 2023.

45.     ScanSource also re-informed Dutchie of the option to pay material liability cost of the Unproduced Custom Products.  Otherwise, Elo would complete manufacturing and ship to

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

ScanSource, and ScanSource would bill Dutchie upon 90 days of holding the inventory for the original sales order total of approximately $12.9 million.

46.     In March 2023, Elo sent ScanSource a proposed offer to reduce the material liability cost of the Unproduced Custom Product from approximately $10.6 million to approximately $8.2 million, payable over the course of the next five months.

47.     In addition to failing to pay for these Custom Products, on March 3, 2023, Dutchie began to default on its payments for products (both custom and non-custom) which ScanSource had already invoiced to Dutchie and shipped directly to Dutchie's end users without a Bill and Hold arrangement ("Run Rate Products"). To date, Dutchie has been invoiced and failed to pay for $850,680.29 in Run Rate Products and other related costs.

48.     On May 16, 2023, Elo renewed its March offer and communicated to ScanSource that it intended to ship all Elo-Held Custom Products to ScanSource no later than May 31, 2023 and would invoice ScanSource accordingly. On May 31, 2023, Elo invoiced ScanSource for the Elo-Held Custom Products.

49.     On May 31, 2023, ScanSource started assessing interest on all past due amounts Dutchie owed at 12% annually beginning May 1, 2023.

50.     Dutchie has not paid ScanSource in full for the Bill and Hold Custom Products, the Forecast-Based Custom Products, the Elo-Held Custom Products, the Unproduced Custom Products, or the Run Rate Products.

## FOR A FIRST CAUSE OF ACTION

### (Breach of Contract)

51.     All prior allegations not inconsistent are realleged and incorporated herein by reference.

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

52.    The Customer Agreement and Supplemental Agreement (collectively, the "Contract") constitute valid and enforceable contracts between ScanSource and Dutchie.

53.    ScanSource has fully performed its obligations under the Contract.

54.    Dutchie has breached the Contract in four material ways.

55.    First, Dutchie has failed to pay for the Bill and Hold Custom Products currently held by ScanSource in its warehouse, which total $10,490,487.19, excluding interest which has been accruing at a rate of 12% annually since February 1, 2023.

56.    Second, Dutchie has failed to pay for the Elo-Held Custom Products invoiced to ScanSource by Elo on May 31, 2023, which total $959,128.80.

57.    Third, Dutchie has failed to pay the material liability costs for the Unproduced Custom Products which Elo invoiced to ScanSource on May 31, 2023, totaling $8,184,781.00.

58.    Fourth, Dutchie has failed to pay for the Run Rate Products that ScanSource shipped as directed by Dutchie and related costs, totaling $850,680.28, excluding interest which has been accruing at a rate of 12% annually since May 1, 2023.

59.    As a result of Dutchie's conduct, ScanSource has suffered damages in the amounts described above, and damages for storage charges as described under the Contract, the amounts owed for Run Rate Products not paid by Dutchie, interest on the Bill and Hold Custom Products and Run Rate Products, and shipping, engineering, and other related costs.

## FOR A SECOND CAUSE OF ACTION

### (Promissory Estoppel)

60.    All prior allegations not inconsistent are realleged and incorporated herein by reference.

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

61.     Dutchie made an unambiguous promise to ScanSource that it would purchase the Custom Products from ScanSource when it submitted POs and monthly forecasts to ScanSource for the Custom Products.

62.     ScanSource reasonably relied on Dutchie's promise when it submitted POs to Elo for the Custom Products and agreed to store the Custom Products for Dutchie.

63.     ScanSource's reliance on Dutchie's promise was expected and foreseeable as evidenced by the terms of the Customer Agreement and Supplemental Agreement.

64.     In reliance on Dutchie's promise, ScanSource has suffered damages, including the amounts paid, payable, or owed to Elo for the Custom Products, damages for storage charges as described under the Contract, and shipping, engineering, and other related costs.

## FOR A THIRD CAUSE OF ACTION

### (Unjust Enrichment)

65.     All prior allegations not inconsistent are realleged and incorporated herein by reference.

66.     ScanSource conferred a benefit on Dutchie by ordering and delivering the Run Rate Products ($850,680.28) to Dutchie.

67.     Dutchie has realized the benefit by receiving and obtaining title to the Run Rate Products.

68.     ScanSource has also conferred a benefit on Dutchie with respect to the Bill and Hold Custom Products ($20,485,077.27) and the Forecast-Based Custom Products ($4,288,683.28) by ordering and transferring title to these products to Dutchie and storing these products at its own expense.

69.     Dutchie has realized the benefit by obtaining title to, and receiving storage of, the Bill and Hold Custom Products and the Forecast-Based Custom Products.

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

70.     It would be inequitable for Dutchie to retain these benefits because Dutchie has failed to remit full payment to ScanSource for the Run Rate Products, the Bill and Hold Custom Products, and the Forecast-Based Custom Products.

71.     As a result, ScanSource has suffered damages for the amounts owed for the Run Rate Products, the Bill and Hold Custom Products, and the Forecast-Based Custom Products not paid by Dutchie and all related costs.

## PRAYER FOR RELIEF

**WHEREFORE**, ScanSource prays for an Order of this Court as follows:

(a)     That Dutchie breached the Contract and owes ScanSource for the amounts described in this Complaint;

(b)     That ScanSource may recover under a theory of promissory estoppel;

(c)     That ScanSource may recover under a theory of unjust enrichment;

(d)     An award of pre-judgment interest under S.C. Code Ann. § 34-31-20;

(e)     An award of post-judgment interest under S.C. Code Ann. § 34-31-20; and

(f)     Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By:/s/ Samuel W. Outten
     Samuel W. Outten, SC Bar No. 4295
     E-Mail: sam.outten@nelsonmullins.com
     Abigail L. Wood, SC Bar No. 105426
     E-Mail: abigail.wood@nelsonmullins.com
     2 West Washington Street / Suite 400
     Post Office Box 10084 (29603-0084)
     Greenville, SC 29601
     Telephone: (864) 373-2300

*Attorneys for ScanSource, Inc.*

Greenville, South Carolina
June 30, 2023

# EXHIBIT A

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373



APPLICATION

ELECTRONICALLY FILED - 2023 Mar 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

(800) 944-3647 ext. 4060
SalesPartnerOnboarding@ScanSource.com
ScanSource Financial Services
You can apply online at:
www.scansource.com

**X**  INVOICE WEEK - 20 DAYS
PAYMENT REMITTANCE DATE: W

| DATE OF APPLICATION | TRADE CREDIT LIMIT REQUESTED | ☐ CREDIT CARD | ☐ PREPAY VIA WIRE |
|---|---|---|---|
| 9/28/2021 | <$10,000 | | |

## COMPANY INFORMATION

| ☒ C CORPORATION | ☐ S CORPORATION | ☐ LIMITED LIABILITY COMPANY | ☐ PARTNERSHIP | ☐ SOLE PROPRIETORSHIP |
|---|---|---|---|---|

**COMPANY'S COMPLETE LEGAL NAME (Please print or type)**
Courier Plus, Inc.

**DOING BUSINESS AS NAME**
Dutchie

**COMPANY WEBSITE**
www.dutchie.com

**CORPORATE PHONE NUMBER**
866-838-8244

**YEAR ESTABLISHED**
2018

**STATE OF INCORPORATION**
Delaware

**MAILING ADDRESS OF CORPORATE OFFICE**
2728 NW Potts Ct, Ste 100

**STREET ADDRESS OF CORPORATE OFFICE (If different than mailing address)**
2728 NW Potts Ct, Ste 100

| CITY | STATE | POSTAL CODE | CITY | STATE | POSTAL CODE |
|---|---|---|---|---|---|
| Bend | Oregon | 97703 | Bend | Oregon | 97703 |

**FEDERAL EMPLOYER IDENTIFICATION NUMBER**
████████

Note: Please attach a copy of exemption certificate(s) for each state or use the Multijurisdiction Form Tax Certificate. Forms are available for download at: http://www.scansource.com/pages/customer-application-blank-forms

## CONTACT INFORMATION

**EXECUTIVE CONTACT NAME**
Ross Lipson

**ACCOUNTS PAYABLE CONTACT NAME**
Andrea Schlechter

**EXECUTIVE CONTACT TITLE**
Chief Executive Officer

**ACCOUNTS PAYABLE CONTACT TITLE**
Senior Manager, Corporate Accounting

**EXECUTIVE CONTACT PHONE**
866-838-8244

**ACCOUNTS PAYABLE CONTACT PHONE**
866-838-8244

**EXECUTIVE CONTACT EMAIL ADDRESS**
ross@dutchie.com

**ACCOUNTS PAYABLE CONTACT EMAIL ADDRESS**
ap@dutchie.com

**INVOICE RECIPIENT EMAIL**
ap@dutchie.com

**MONTHLY STATEMENT RECIPIENT EMAIL**
blake.gowing@dutchie.com

**SALES ORDER CONFIRMATION EMAIL**
blake.gowing@dutchie.com

**SHIPMENT TRACKING EMAIL**
blake.gowing@dutchie.com

Please indicate if you authorize ScanSource, Inc. to communicate with your company via email:   ☐ YES   ☐ NO

If you are applying for invoice week payment terms, we request that you provide your company's two most recent fiscal year end and any current interim financial statements including balance sheet and income statement. Please attach this information. All financial information will be for the exclusive use of ScanSource Financial Services and will remain confidential.

## PRODUCT LINES

| ☐ COMMUNICATION PRODUCTS | ☐ POS AND BARCODING PRODUCTS | ☐ NETWORKING PRODUCTS | ☐ SECURITY PRODUCTS | ☐ SERVICES |
|---|---|---|---|---|

## AUTHORIZED SIGNATURE

By signing this application, Applicant hereby acknowledges that it is submitting the Application to ScanSource, Inc. and each of its subsidiaries and/or affiliates. Applicant hereby gives the right to each of ScanSource, Inc. its subsidiaries and affiliates to rely on this Application in considering the extension of trade credit at any time. Applicant's authorized signature constitutes a representation of the trust and accuracy of all statements made on this Application and its express agreement to abide by the Terms and Conditions of Sale on the second page hereof. A faxed or emailed copy of the signature will be considered an original.

| AUTHORIZED APPLICANT NAME (Please type or print) | TITLE | SIGNATURE | DATE |
|---|---|---|---|
| | | | Sep 28, 2021 |

anSource, Inc., including its subsidiaries and/or affiliated entities ("Seller") makes all sales of its products and services ("Products") to Buyer subject to the following terms and conditions:

**Pricing/Purchase Orders/Acceptance of Terms and Conditions.** All Products sold by Seller to Buyer shall be at the standard prices set forth in Seller's current catalog of Products at the time the order is submitted to Seller. Buyer shall submit all orders for products to Seller using a method approved in writing by Seller, which includes by telephone and by electronic data interchange ("EDI") if Buyer has completed and provided to Seller Seller's standard EDI Trading Partner Agreement. Any and all purchase orders, however communicated, are subject to the terms and conditions of this agreement, and Seller does not accept, and expressly objects to and rejects, any other terms and conditions (whether written or oral) originating from Buyer that purport to modify, add to, or otherwise vary the terms and conditions of this agreement. To facilitate future cross-reference, Buyer shall note on the face of each submitted purchase order that the terms of this agreement control; provided, however, if Buyer fails to include any such notation, the parties hereby agree that the terms and conditions of this agreement shall still control.

**Shipment/Title/Risk of Loss/Taxes.** Title to the Products shall pass to Buyer upon delivery of the Products to (1) the common carrier or (2) Buyer's representative at Seller's dock. Seller's delivery of the Products shall be Ex Works Seller's shipping point with all risk of loss, damage, theft or destruction passing to Buyer at such point, subject to Seller's rights under applicable law. No such loss, damage, theft or destruction to the Products, in whole or in part, shall impair the obligations of Buyer under this agreement, all of which shall continue in full force and effect. Seller shall not be liable for any shipping delays. Buyer shall bear all applicable federal, state, municipal or other governmental tax, as well as any applicable import or customs duties, license fees and similar charges, however designated or levied on the sale of Products (or delivery thereof) or measured by the purchase price paid for the Products.

**Shortages/Rejection of Delivery.** All claims for shortages or rejection of delivery must be made by Buyer to Seller in writing within a period of forty-eight (48) hours from receipt of Products and must state in reasonable detail the grounds therefore. Unless such notice is given within the stated period of time, Buyer agrees that it shall be conclusively presumed that Buyer has fully inspected the Products and acknowledged that NO shortage or grounds for rejection exists.

**Security Interest.** Buyer grants Seller a security interest in all Products sold hereunder and to all Products now or hereafter acquired by Buyer from Seller, and to any proceeds thereof, until the purchase price and any other amounts due to Seller have been paid in their entirety. Buyer hereby authorizes Seller to prepare and file any financing statement listing the Products as collateral and to file any such financing statement in such filing offices as the Seller may deem appropriate. Buyer further agrees promptly to execute any other documents requested by Seller in order to protect Seller's security interest. Upon any default by Buyer of any of its obligations to Seller, Seller shall have all the rights and remedies of a secured party under the Uniform Commercial Code which rights and remedies shall be cumulative and not exclusive.

**Payment.** Unless otherwise agreed in writing by Seller, all credit purchases must be paid in accordance with Seller's normal terms of sale, which are Net twenty (20) days from date of invoice. All past due amounts are subject to a one and a half percent (1.5%) monthly financing charge or the maximum permissible under applicable law, whichever is lower. All drafts dishonored for any reason shall be assessed a twenty-five dollar and 00/100 ($25.00) service charge. In the event that Buyer stops payment on any draft issued to Seller, for any reason, Buyer hereby recognizes that Seller would suffer damage, the exact amount of which cannot be determined with certainty, and Buyer shall pay Seller liquidated damages in the amount of five hundred and 00/100 ($500.00) for each such draft in addition to the purchase price. Buyer may not use anticipated credit memos before Seller issues the credit on account. Payment using an anticipated credit memo before Seller has issued credit will be considered a short payment and may result in delayed shipments. It is not Seller's policy to issue refunds. Credit memos must be used on current outstanding balances or future purchases. In the event that Buyer utilizes a credit card to purchase Products, Buyer must provide Seller with the credit card information as requested. Buyer acknowledges and agrees that all credit card purchases hereunder are duly authorized and that it will not initiate any disputes with the credit card issuer related to payments to Seller or any of its successors or assigns in connection with such purchases. All credit card payments requested post point of sale hereunder will be assessed a convenience fee equal to two percent (2%) of the total invoice amount. Seller has no continuing obligation to deliver Products to Buyer and credit approval may be withdrawn by Seller at any time without prior notice. Seller may extend credit to Buyer for purchasing Products to the extent Buyer may be eligible under the applicable Seller's programs and consistent with Buyer's credit capability, as determined by Seller from time to time in Seller's absolute discretion. Seller may, in its absolute discretion, refuse to establish an account with Buyer, place Buyer's account on hold, and/or refuse to deliver Products or accept orders from Buyer to the extent any principal(s) or shareholder(s) of Buyer, any entity with which such principal(s) or shareholder(s) are affiliated, or any subsidiary or affiliate of Buyer has a delinquent or past due account with Seller. In the event that Buyer's account with Seller is dormant for more than six (6) months and has a credit balance, Buyer agrees that Seller may impose a monthly administrative charge for inactivity at a rate of the lesser of ten and 00/100 dollars ($10.00) a month or the credit balance outstanding on Buyer's account. Seller without waiver or limitation of any rights or remedies, shall be entitled from time to time to deduct from any amounts due or owing by Buyer to Seller any and all amounts owed by Seller to Buyer. Buyer acknowledges and agrees that Seller shall be entitled to apply all payments to Buyer's account(s) as Seller deems fit in its sole and absolute discretion.

**Returns.** The terms for all Product returns, for whatever reason, are limited to those set forth in Seller's return merchandise authorization ("RMA") policies and procedures, which are located on Seller's website and in Seller's catalog. These policies and procedures may be modified in any manner by Seller at any time. All returns must be accompanied by an RMA from Seller. All returns are subject to in-house credit only. The time periods allowed for returns are determined by manufacturers of the Products and are printed in Seller's catalog.

**No Warranties by Seller.** Product warranties, if any, are provided by the manufacturer or publisher of the Products. Seller makes no warranties whatsoever. IN NO EVENT SHALL SELLER BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL, INDIRECT OR PUNITIVE DAMAGES OR DAMAGES OF ANY KIND OR NATURE ALLEGED TO HAVE RESULTED FROM ANY BREACH OF WARRANTY. SELLER DOES NOT WARRANT THE MERCHANTABILITY OF THE PRODUCTS OR THEIR FITNESS FOR ANY PARTICULAR PURPOSE. SELLER SHALL HAVE NO DUTY TO DEFEND, INDEMNIFY, AND HOLD HARMLESS BUYER FROM AND AGAINST ANY AND ALL DAMAGES OR COSTS INCURRED BY BUYER ARISING FROM THE INFRINGEMENT OR VIOLATION OF ANY PATENTS, TRADEMARKS, COPYRIGHTS OR OTHER PROPRIETARY RIGHTS BY ANY PRODUCTS. SELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED. NOTWITHSTANDING ANY OTHER TERMS OR CONDITIONS TO THE CONTRARY, SELLER'S LIABILITY UNDER THIS SECTION SHALL NOT EXCEED THE PURCHASE PRICE OF THE PRODUCT GIVING RISE TO THE ALLEGED LIABILITY.

**Events of Default.** Buyer shall be in default under this agreement upon the happening of any of the following events or conditions: (a) default by Buyer on payment of any installment, invoice, bill or any other indebtedness or obligation now or hereafter owed by Buyer to Seller; (b) default in the performance of any obligation, covenant or liability contained in this agreement or any other agreement or document between Buyer and Seller; (c) any inaccuracy with respect to any warranty, representation or statement made or furnished by Buyer; (d) dissolution, termination of existence, insolvency, business failure, or discontinuance of Buyer's business or the appointment of a receiver for any part of the property of, or assignment for the benefit of creditors by Buyer or the commencement of any proceedings under any bankruptcy reorganization or arrangement laws by or against Buyer or the attachment, levy, seizure or garnishment of any of Buyer's property, rights, assets (contingent or otherwise) including the Products; or (e) any change in control of the ownership or management of Buyer, unless prior to the occurrence of such change of control Seller shall have been notified in writing and Buyer shall have obtained Seller's prior written approval to such change in control.

**Remedies of Seller.**

a. **In General.** Upon the occurrence of any event of default or any time thereafter, Seller may, at its option and without notice to Buyer, exercise one or more of the following remedies as Seller, in its sole discretion, shall elect: (1) declare immediately due and payable all outstanding invoices under this or any other contract and demand or, without demand, sue for amounts then due or thereafter accruing under this invoice or under any other invoice, bill or other document evidencing Buyer's indebtedness to Seller, (2) suspend deliveries as to any or all Products, (3) take possession of the Products wherever found and for this purpose enter upon any premises of Buyer and remove the Products, without court order or other process of law, without any liability for damages, suit, action or other proceeding by Buyer as a result of such entry and/or removal, (4) cease Buyer, at its expense, to promptly return the Products to Seller in good, like-new condition, (5) sell the Products, or any part thereof at public or private sale (for cash or credit) at such time or times as Seller shall determine, free and clear of any rights of Buyer, and if notice thereof is required by law, any notice in writing of any such sale by Seller to Buyer not less than ten (10) days prior to the date thereof shall constitute reasonable notice thereof to Buyer, and (6) exercise any and all rights accruing to Seller under any applicable contract or law upon a default by Buyer, including all rights and remedies accorded to sellers or secured parties under the Uniform Commercial Code.

b. **Mitigation of Damages.** Should Seller repossess any of the Products because of Buyer's default, Seller may make a commercially reasonable effort to sell such Products at a reasonable price to a third party, provided, however, that Seller shall have no obligation to actively seek out and solicit potential third party Buyers for said Products.

c. **Collection Costs.** In the event of any default on the part of Buyer hereunder, Buyer shall pay any and all collection costs, including reasonable attorneys' fees and costs, incurred by Seller.

d. **Rights and Remedies Not Exclusive.** No right or remedy conferred upon or reserved to Seller by this agreement shall be exclusive of any other right or remedy provided herein or by law. All rights or remedies conferred upon Seller by this agreement and by law shall be cumulative and in addition to any other right or remedy available to Seller.

**Time of the Essence.** Time is of the essence with respect to each of the provisions of this agreement.

**Indemnification.** Buyer agrees to indemnify and hold Seller and its officers, directors, servants, employees, agents and advisors harmless from and against any and all claims, damages, costs, expenses (including, but not limited to, reasonable attorneys' fees and costs) or liabilities that may result, in whole or in part, from any third party using the Products provided under this agreement. Any defense provided hereunder shall be by counsel of Seller's choice.

**Limitation of Liability.** In the event that any Product malfunctions and such malfunction leads to damage or injuries to the Product, to Buyer's business, the end-user's business, to other equipment, or residence, or to employees or to other persons, Seller shall not be liable for such damages or injuries, and Buyer, for itself and its successors in interest, hereby forever releases and discharges Seller from any such liability. Buyer understands and agrees that if, despite the Buyer's release of the Seller from liability, Seller shall be found liable for loss or damage caused by failure of Seller or Seller's obligations hereunder or the failure of the Products in any respect whatsoever, Seller's liability shall be limited to the price paid for such Products, and this liability shall be exclusive. Buyer understands and agrees that the provisions of this section shall apply if loss or damage, irrespective of cause or origin, results directly or indirectly to persons or property, from performance or non-performance of any of Seller's obligations or from negligence, active or otherwise, of Seller, or its agents, servants, assignees or employees. IN NO EVENT SHALL SELLER BE LIABLE FOR AMOUNTS REPRESENTING INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**Assignment.** This agreement and all rights, obligations and performance hereunder may not be assigned by Buyer without prior written consent of Seller.

**Waiver.** No delay or omission by Seller to exercise any right or power shall impair any such right or power or be construed to be a waiver thereof. A waiver by Seller of any term, condition or agreement to be performed by Buyer or any breach thereof shall not be construed to be a waiver of any succeeding breach thereof or of any other term, condition or agreement herein contained. No change, waiver, or discharge hereof shall be valid unless presented in writing to Seller and signed by an authorized representative of Seller.

**Severability.** If any section, term, condition or portion of this agreement shall be found to be illegal or void as being against public policy, it shall be stricken and the remainder of this document shall stand as the original.

**Governing Law/Venue.** This agreement shall be construed and enforced in accordance with the laws of South Carolina without regard to the conflicts of law provisions thereof. ALL SALES TRANSACTIONS EXCLUDE THE APPLICATION OF THE 1980 UNITED NATIONS CONVENTION ON CONTRACTS FOR THE INTERNATIONAL SALES OF GOODS, IF OTHERWISE APPLICABLE. All claims, actions, disputes, controversies or suits shall be litigated exclusively in the courts of South Carolina. Each party specifically consents to service of process by and the jurisdiction of and venue in those courts and Buyer, if not a resident of the United States, hereby appoints the Secretary of State of South Carolina as its agent for service of process in the United States.

**Incorporation of Manufacturer Terms.** Sales of Products may be subject to other terms, conditions or policies established (and modified from time to time) by the manufacturer or publisher of the Products or the Products are available on Seller's website including without limitation the domain names www.seansource.com and/or any equivalent or successor thereof.

**Entire Agreement/Modification.** The parties intend this agreement to be the complete statement of the terms of their agreement. This agreement replaces and supersedes any prior agreements between them with respect to the subject matter hereof. No course of prior dealing or usage of trade shall be relevant to amend or interpret this agreement. This agreement may not be changed, modified or amended except by an instrument in writing signed by both Seller and Buyer.

**Compliance with Laws.** The parties agree to comply with the laws, regulations and requirements of the United States. This includes, without limitation, the applicable export control and economic sanctions laws, regulations and requirements administered by the Commerce Department's Bureau of Industry and Security and the Treasury Department's Office of Foreign Assets Control as they may govern the export and re-export of items supplied under these Terms and Conditions. These commodities, technology or software were exported from the United States in accordance with the Export Administration Regulations. Contrary to U.S. law is prohibited. Buyer further agrees that it will not make any payment, directly or indirectly, that would cause a violation of the anti-bribery laws of any country or jurisdiction, including without limitation the U.S. Foreign Corrupt Practices Act which, inter alia, prohibits certain payments to foreign government officials for the purpose of obtaining or retaining business. The Federal Equal Credit Opportunity Act (ECOA) prohibits creditors from discriminating against credit applications on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract) because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith, exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with law concerning the creditor is the Federal Trade Commission, Division of Credit Practices, 600 Pennsylvania Avenue, NW, Washington, DC 20580.

**No Agent.** It is understood that Buyer is not an agent of Seller and shall not refer to the Seller's corporate name in any of its products or literature without the express written consent of the Seller.

**Notices.** All notices and other communications relating to this agreement or its terms must be either: (1) in writing and sent via first class United States Postal Service certified or registered mail with return receipt requested; or (2) via FedEx or other similar overnight courier to the address set forth above. All such notices must be sent to Vice President of Reseller Financial Services with a copy to General Counsel at 6 Logue Court, Greenville, SC 29615. All notices sent by Seller hereunder will be deemed received two (2) days after postmark or shipping date, or on the day of actual receipt if earlier. In addition, Seller may provide notices hereunder to Buyer via facsimile to the facsimile number(s) Buyer provided to Seller via Buyer's completion of Seller's credit application, with such facsimile notices being deemed received upon Seller's receipt of its facsimile machine's confirmation of successful transmission. If the day on which such facsimile is received by Buyer is not a business day or is after five p.m. on a business day, then such facsimile shall be deemed to have been received on the next following business day.

# Courier Plus, Inc.

Final Audit Report                                                          2021-09-28

| Created: | 2021-09-28 |
|---|---|
| By: | Nathan Rounsville (nathan.rounsville@scansource.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAyDPfQeZv18_mQfd8gT7yPqUSTicu0sSF |

# "Courier Plus, Inc." History

📄 Document created by Nathan Rounsville (nathan.rounsville@scansource.com)
2021-09-28 - 7:16:50 PM GMT- IP address: 13.110.14.8

📤 Document emailed to Ross Lipson (ross@dutchie.com) for signature
2021-09-28 - 7:16:55 PM GMT

📄 Email viewed by Ross Lipson (ross@dutchie.com)
2021-09-28 - 7:26:42 PM GMT- IP address: 67.204.152.215

✍ Document e-signed by Ross Lipson (ross@dutchie.com)
Signature Date: 2021-09-28 - 7:27:15 PM GMT - Time Source: server- IP address: 67.204.152.215

✅ Agreement completed.
2021-09-28 - 7:27:15 PM GMT

 Adobe Sign

# EXHIBIT B

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

**Paracon**
empowering solution providers.

*TO : XAVIER CARTIAUX*
*FAX : 32. 4. 246.78.50*
*FROM : GREGORY*
*Original*
*CC : Elo - Copy*

# DISTRIBUTORSHIP AGREEMENT

reement ("Agreement"), effective as of the 1st day of March,
1998, is between Elo TouchSystems, Inc. ("Elo"), a Tennessee corporation with offices at 6500
Kaiser Drive, Fremont, California 94555-3613, and ScanSource, Inc. ("Distributor"), a South
Carolina corporation with offices at 6 Logue Court, Suite G, Greenville, SC 29615.

This Agreement has been developed because Elo wishes to sell certain products to certain
of its customers through distribution, and believes that Distributor effectively can sell such
products and service such sales.

By its execution of this Agreement Distributor accepts its appointment as an Elo
distributor on the terms and subject to the conditions set forth in this Agreement and Exhibits.

THE PARTIES AGREE AS FOLLOWS:

### 1.    APPOINTMENT OF DISTRIBUTOR

Elo hereby appoints Distributor as a distributor of the Elo products described in Exhibit A
hereto, together with such other Elo products as Elo may, in its sole discretion, designate from
time to time by notice to Distributor (collectively, "Products"), to the specific purchasers
("Purchasers") doing business in the Point of Sale Marketplace ("POS"), as defined in this
Section 1. The POS shall consist of all Purchasers serving the restaurant and hospital industries
and the retail sector. Distributor is authorized to sell to Purchasers only in the geographic area
identified in Exhibit B ("Territory"). For purposes of this Section 1, a sale is made in the
geographic area from which the purchase order issues. Exhibit A and B may be amended during
the term of this Agreement, in whole or in part, by Elo upon sixty (60) days prior written notice
to Distributor. Elo shall have the right to terminate this Agreement immediately if Distributor
fails to comply with the provisions of this Section 1.

### 2.    RIGHTS AND OBLIGATIONS OF DISTRIBUTOR AND ELO

The parties' rights and obligations under this Agreement shall, without limitation, include
the following:

2.01    Sales Territory. Distributor acknowledges that Distributor's right to sell Products
shall be non-exclusive, and that Elo may appoint other persons (including other distributors and
sales representatives) to sell Products. In addition, Elo itself may sell Products and may call on
Purchasers and prospective Purchasers, investigate and resolve Purchaser complaints, distribute
sales and advertising information, and perform other services for Purchasers. Distributor shall
have no right to any compensation with respect to sales of Products by any person other than
Distributor.

2.02    Referral of Sales Prospects to Elo and Assistance on Sales of Product by Elo. If
Distributor becomes aware of opportunities for the sale of Elo products which, due to technical,

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

financial, geographic, service, or other limitations, Distributor is unable to pursue on its own behalf, Distributor shall refer such opportunities to Elo.

2.03    Promotion and Sales.  Distributor shall use its best efforts to promote, maintain and increase sales of Products using only legal and ethical means.  Distributor's activities shall include, but are not necessarily limited to advertising, demonstration of models, processing of orders and Purchaser complaints, identification of Distributor as a source of Products in business listings, trade publications, directories, stationery and advertisements, and through the distribution of technical literature, catalogues, brochures and advertising matter provided to Distributor by Elo.  Elo shall provide Distributor with such marketing direction and guidance, including marketing materials, seminars and sales training programs, as Elo deems appropriate. Distributor may qualify to use Elo co-op marketing funds to finance part of its marketing activities where, and when, Elo determines appropriate.

Distributor shall not publish, distribute, cause to be published or cause to be distributed any advertising or other material which describes or pertains to any Products or refers to Elo unless such materials are either furnished by Elo or approved by Elo in writing prior to such publication or distribution.  Distributor shall not relabel Products unless expressly authorized in advance by Elo and Distributor's customer in writing.  Distributor shall prepare reports, order forecasts, and other information concerning POS sales and other matters as Elo shall reasonably request, and Distributor shall follow Elo's Distributor policies, which policies may be amended by Elo from time to time.  Distributor shall not act in any way detrimental to Elo's goodwill and reputation and shall take such action(s) to preserve and enhance Elo's goodwill and reputation as Elo reasonably may request.

2.04    Staff and Facilities.  Elo shall provide such Product support and technical assistance in the Territory as it deems appropriate.  Distributor shall maintain an adequate and aggressive staff of sales and support personnel with sufficient knowledge to enable such staff effectively to promote sales of Products and solicit orders for Products.  Distributor also shall maintain, at all times during the term of this Agreement, adequate facilities, equipment and means of transportation in order to fulfill its obligations under this Agreement.

2.05    Purchaser Relations.  Distributor shall establish and maintain contact with Purchasers and prospective Purchasers in the Territory, provide assistance for the use of Products within the Territory, and make every reasonable effort to satisfy all needs of Purchasers and prospective Purchasers in the Territory.  Distributor shall deliver to Elo, within ten (10) days of receipt, copies of all written complaints relating to Products received by Distributor from Purchasers or other persons.  At such times and intervals as Elo reasonably may request, Distributor and its employees shall participate in Elo's sales training programs and seminars for its distributors.  As Elo reasonably may request, Distributor also shall arrange for and participate in calls on Purchasers and prospective Purchasers, both with and without Elo personnel.

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

2.06    Confidential Information.  Distributor shall, during the term of this Agreement and thereafter, maintain the confidentiality of any and all confidential or proprietary information or data of Elo including, without limitation, technical specifications, engineering data and price information (including quotations) respecting Products, lists of Purchasers and distributors, and any proposals made to or received from prospective Purchasers or distributors (collectively, "Proprietary Materials").  Such Proprietary Materials shall at all times remain the property of Elo and shall be deemed to have been furnished to Distributor in confidence and solely in connection with Distributor's obligations under this Agreement.  Upon termination for any reason of this Agreement, Distributor immediately shall deliver to Elo all written documentation, including copies, of or concerning such Proprietary Materials, shall make no further use thereof, and shall make reasonable efforts to insure that no further use thereof is made by Distributor's employees, agents or contractors.  In the event that any of Distributor's employees, agents or contractors are terminated for any reason, Distributor shall recover such materials from such persons and shall make reasonable efforts to assure no further use of Proprietary Materials by such persons. Distributor's obligations under this Section 2.07 shall survive the expiration or termination of this Agreement.

2.07    Independent Contractors.  The relationship of Elo and Distributor established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to (i) give either party the power to direct and control the day-to-day activities of the other, (ii) constitute the parties as partners, joint venturers, co-owners or otherwise as participants in a joint undertaking, or (iii) allow Distributor to create or assume any obligation on behalf of Elo for any purpose whatsoever.  All financial and other obligations associated with Distributor's business are the sole responsibility of Distributor.  Distributor acknowledges and agrees that it is not a franchisee of Elo as such may be defined in any United States jurisdiction. Distributor shall be solely responsible for, and shall indemnify and hold Elo free and harmless from, any and all claims, damages or lawsuits (including Elo's attorneys' fees) arising out of the acts of Distributor, its employees or its agents.

2.08    Advising of Changes.  Distributor shall promptly advise Elo of (i) any changes in Distributor's status, organization, personnel, and similar matters, (ii) any changes in the key personnel, organization, and status of any major customers of Elo in the Territory, and (iii) any political, financial, legislative, industrial or other events in the Territory that could affect the mutual business interests of Distributor and Elo, whether harmful or beneficial.

2.09    Books and Records.  Distributor shall maintain and make available to Elo accurate books, records, and accounts relating to the business of Distributor with respect to the Products.

3.    ORDERS

3.01    Terms and Conditions.  Orders by Distributor shall be subject to acceptance by Elo at Fremont, California, or such other place(s) as may be designated by Elo.  Except as modified by this Agreement, all orders shall be accepted subject to the terms and conditions of Elo's then current Terms and Conditions of Sale ("Order Terms") the current version of which is attached hereto as Exhibits C and incorporated herein by reference.  The Order Terms may be

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

*with 30 day* EMV

changed at any time, and from time to time, by Elo ~~without prior~~ notice to Distributor, provided that any such change shall have no effect on orders already placed by Distributor and accepted by Elo at the time of such change. No term or condition contained in any request for quotation, purchase order or other form of order or writing by Distributor (whether printed, stamped, typed or written) will govern or apply to any sale of any Product by Elo to Distributor unless first specifically agreed to in writing by Elo. Breach by Distributor of any provision of the Order Terms shall constitute a breach of this Agreement. In the event of any inconsistency between the Order Terms and any provision of this Agreement, this Agreement shall be controlling.

3.02   Acceptance of Orders. No order shall be considered finally accepted by Elo except by Elo's written acknowledgment or by (and only to the extent of) shipment of the Products covered by that order. If Products are ordered by Distributor and Elo does not have sufficient stock to fill such order, or if Elo determines that it cannot fill such order in the usual course of business, Elo may at its option (i) not fill the order; (ii) allocate Products as to which there is a shortage among its customers in any manner it deems reasonable; or (iii) accept the order on such conditions as it deems appropriate.

3.03   Cancellation of Orders by Distributor. Distributor may cancel orders only with the prior written consent of Elo. In the event that a cancellation is approved by Elo, all costs incurred by Elo for work performed, materials used, or products manufactured up to the time of cancellation or approval thereof by Elo, whichever is later, will be charged to Distributor and paid by Distributor within thirty (30) days after written notification thereof by Elo.

3.04   Rejection or Cancellation of Orders by Elo. Elo may reject any order for any reason and may cancel any order previously accepted if Elo determines that (i) such order will not be paid for in accordance with the Order Terms or the terms and conditions of this Agreement; (ii) Distributor is in default under this Agreement or any other agreement relating to any Product, including the Order Terms; or, (iii) allocation constraints prevent it from filling such order, in whole or in part.

4.   **PRICE; PAYMENT TERMS AND RETURNS**

4.01   Price. The price to Distributor for any Product shall be at the published Elo distributor price list ("Price List") on the date of acceptance of the order by Elo, or where no such Price List exists, at the price quoted by Elo no greater than thirty (30) days prior to the date of acceptance of the order. Such price is subject to Distributor's compliance with the terms of this Agreement. All Products sold and all prices quoted by Elo are F.O.B. Elo's Fremont, California, facility. Freight will be invoiced to and payable by Distributor. Prices quoted do not include any federal, state or local taxes which Elo may be required to pay or collect upon the sale or delivery of any Product or the collection of the sales price, and Distributor shall pay all such taxes. Elo shall have the right, upon thirty (30) days written notice to Distributor, to change any price, freight term or discount with respect to any Product.

4.02   Price Decreases. In the event Elo decreases the price of any Product, Distributor shall be entitled to a credit equal to the difference between the price paid for the Product by Distributor (less any prior credits granted by Elo on such Products) and the new decreased

-4-

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

distributor price for the Product multiplied by the quantity of such Product in Distributor's inventory shipped from Elo. Similar price adjustment, if appropriate, shall also be made on all Products in transit to Distributor on the effective date of the price decrease. In order to claim such credit, Distributor must submit to Elo, within thirty (30) business days following the effective date of such price decrease or the date Distributor actually receives notice thereof, whichever occurs later, a report of the Products subject to the price decrease and in Distributor's inventory or in transit as of the effective date of the price decrease. All Products shipped after the effective date of any price decrease shall be shipped and invoiced at the price in effect at the time of shipment.

4.03    Payment Terms. Payment terms shall be one and one-half percent (1.5%) fifteen (15) days, net thirty (30) days from date of shipment of Product. Distributor shall make all payments as provided herein without regard to whether Distributor has made or may make any inspection or use of any Products delivered hereunder. Any invoiced amount which is not paid when due shall bear interest at the rate of one and one-half percent (1½%) or the highest rate then permitted by law, whichever is less. Elo shall have no obligation to ship further Products to Distributor if Distributor is in breach of this provision.

4.04    Competitive Allowances. Notwithstanding the provisions of Section 4.01, Elo in its sole discretion may adjust Distributor's purchase price where necessary and with appropriate documentation to enable Distributor to meet competition in sales to Purchasers. Distributor may not deduct such adjustments from amounts owed to Elo without prior approval from Elo. Distributor must submit documentation for competitive allowances within ninety (90) days of acceptance of order. If such documentation is not submitted within the ninety (90) day period or if such allowance is subsequently denied, Distributor will be charged for any adjustment previously taken for such transaction.

4.05    Returns. Distributor may return Products only if said Products fail to comply with applicable specifications due to Elo's fault, or where such return is in accordance with Elo's then applicable Stock Rotation Policy, the current version of which is set forth in Exhibit D hereto. Elo reserves the right to amend the Stock Rotation Policy from time to time upon written notice to Distributor.

5.    SALES REPORTS

By the fifteenth (15th) day of each month, Distributor shall provide Elo with a report stating Distributor's aggregate sales of each Product for the previous month, by type of Product, EloTouchSystems Serial Number, Zip Code, City, and State separately stated for each of Distributor's Purchasers.

6.    WARRANTY AND DISCLAIMER; REMEDY; LIMITATION OF LIABILITY

6.01    WARRANTY AND DISCLAIMER. EXCEPT FOR THE EXPRESS WARRANTY CONTAINED IN THE ORDER TERMS, ELO MAKES NO

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED (INCLUDING IMPLIED WARRANTIES OR MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE) CONCERNING ANY PRODUCT. ALL OTHER GUARANTEES, WARRANTIES, CONDITIONS AND REPRESENTATIONS, EITHER EXPRESS OR IMPLIED, WHETHER ARISING UNDER ANY STATUTE, LAW, COMMERCIAL USAGE OR OTHERWISE, ARE HEREBY EXCLUDED.

6.02    REMEDY FOR BREACH OF WARRANTY. DISTRIBUTOR ACKNOWLEDGES AND AGREES THAT ELO'S SOLE RESPONSIBILITY IN THE CASE OF BREACH OF THE FOREGOING WARRANTY SHALL BE FOR ELO, AT ELO'S ELECTION, TO REPAIR OR PROVIDE A REPLACEMENT FOR THE PRODUCT OR THAT PORTION OF THE PRODUCT WITH RESPECT TO WHICH SUCH WARRANTY IS BREACHED OR TO RETURN ALL PAYMENTS MADE WITH RESPECT TO SUCH PRODUCT OR PORTION THEREOF.

6.03    LIMITATION OF LIABILITY. IN NO EVENT, INCLUDING BREACH OR NON-FULFILLMENT OF THE FOREGOING LIMITED WARRANTY, SHALL ELO BE LIABLE FOR LOSS OF PROFITS OR INDIRECT, INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES OF ANY KIND.

7.    MAINTENANCE SUPPORT

7.01    Customer Support Services. For the first thirty (30) days after Distributor sells the Product(s) to the Purchaser, Distributor shall provide customer support services in respect of Products sold by it, including without limitation making available trained personnel of Distributor to provide telephone assistance and support to Purchasers during normal business hours. Elo will provide Distributor with material to allow its technical support staff to address the most common problems before the Distributor contacts Elo for additional assistance.

7.02    Product ~~Repairs~~ DOA's. For the first thirty (30) days after Distributor sells the Product(s), Distributor shall have the responsibility, at its sole expense, to collect Products returned by its Purchasers, ~~for maintenance or repairs, both under the warranty and outside of the warranty. Elo shall perform all actual maintenance and repair services on the Products at its plant in Fremont, California. Each Product returned by Distributor to Elo for maintenance or repairs shall be accompanied by a report of Distributor describing the nature and cause of any error or malfunction. Elo will provide Distributor with a quotation, including price and lead time, for out-of-warranty repairs.~~ Distributor will return all DOA product to Elo for credit, after Distributor has tested product and stated Nature of DOA. *[handwritten initials]*

8.    TERM AND TERMINATION

8.01    (a) Term. This Agreement shall remain in full force and effect for the period commencing on March 1, 1998 and expiring on the following June 30th. This Agreement shall automatically be extended for additional, consecutive terms of one (1) year, each on the terms and conditions set forth in this Agreement, unless prior to the sixtieth (60th) day before the end

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

of the initial term or of any succeeding term, as the case may be, either party to this Agreement gives written notice to the other party that the Agreement will not be renewed beyond the then current term. In such event, this Agreement shall terminate at the end of such term.

(b) <u>Termination</u>. In addition to the provisions of Section 8.01, this Agreement may be terminated at any time during the term as follows:

(1) by either party for any reason upon sixty (60) days prior written notice to the other party;

(2) by mutual consent in writing at any time;

(3) by Elo as provided in Sections 1, 5.02 and 5.04 of this Agreement;

(4) by either party immediately upon the giving of notice that the other party is in breach of any of its material obligations under this Agreement or under the Order Terms;

(5) by either party immediately upon the giving of notice of termination in the event of the termination for any reason of any other agreement between the parties; or

(6) by Elo immediately (i) if, without Elo's prior written consent, control of more than twenty-five percent (25%) of the ownership of Distributor or more than 50% of Distributor's assets are transferred to a person or entity; (ii) if any proceeding in bankruptcy, reorganization or arrangement for the appointment of a receiver or trustee to take possession of Distributor's assets or any other proceeding under any law for the relief of creditors shall be instituted by or against Distributor; or if (iii) Distributor shall make an assignment for the benefit of its creditors.

Distributor agrees that Distributor immediately shall give written notice to Elo of the occurrence of any event of the type described in Section 8.01(b)(6) above.

8.02    <u>Rights and Obligations Upon Termination</u>. All orders from Distributor not shipped on the date that notice of termination of this Agreement is delivered or on the date that this Agreement otherwise terminates may be deemed canceled at Elo's discretion. Elo is authorized to take any necessary steps to insure continued service to the end customer in the event of termination for any reason. Upon termination of this Agreement, Distributor shall remove all signs and cease using any advertising materials relating to Products or Elo, shall immediately discontinue any previously authorized use of Elo trademarks, service marks or trade names, and shall cease all conduct which might cause anyone to believe that Distributor is a distributor of Products or otherwise connected with Elo.

8.03    <u>Repurchase of Products</u>. If this Agreement is terminated by Elo for any reason, Elo shall repurchase from Distributor repurchaseable Products then in Distributor's inventory

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

and Distributor shall immediately tender all such Products to Elo. If this Agreement is terminated by Distributor for any reason, Elo shall have the option, but shall not be obligated, to repurchase repurchaseable Products then in Distributor's inventory. Elo may exercise its right to repurchase within sixty (60) days of termination of the Agreement. Repurchaseable Products are those Products which are not obsolete, are in original non-broken packaging and are, as determined by Elo, resaleable within one (1) year.

8.04    NO DAMAGES ARISING FROM TERMINATION. DISTRIBUTOR ACKNOWLEDGES AND AGREES THAT ELO SHALL BE UNDER NO OBLIGATION TO RENEW OR EXTEND THIS AGREEMENT NOTWITHSTANDING ANY ORDERS PLACED BY DISTRIBUTOR OR ANY OTHER ACTIONS TAKEN BY EITHER OR BOTH PARTIES PRIOR TO TERMINATION OF THIS AGREEMENT. DISTRIBUTOR AGREES THAT UPON TERMINATION OF THIS AGREEMENT FOR ANY REASON, ELO SHALL NOT BE LIABLE TO DISTRIBUTOR FOR ANY TERMINATION COMPENSATION WHATSOEVER, WHETHER BASED UPON GOODWILL ESTABLISHED, CLIENTELE OR PURCHASERS OBTAINED, EXPENDITURES INCURRED, INVESTMENTS MADE BY DISTRIBUTOR OR OTHERWISE. UPON TERMINATION OF THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY DAMAGES (WHETHER DIRECT, CONSEQUENTIAL, OR INCIDENTAL, INCLUDING EXPENDITURES, LOSS OF PROFITS OR PROSPECTIVE PROFITS OF ANY KIND) ARISING OUT OF SUCH TERMINATION. SUCH TERMINATION SHALL NOT, HOWEVER, EXCUSE EITHER PARTY FROM BREACH OF THIS AGREEMENT OR OF THE ORDER TERMS OR FROM ANY OTHER OBLIGATION SURVIVING TERMINATION OF THIS AGREEMENT, AND FULL LEGAL AND EQUITABLE REMEDIES SHALL REMAIN AVAILABLE FOR ANY BREACH OF THIS AGREEMENT OR OF THE ORDER TERMS.

9.    MISCELLANEOUS

9.01 .  Entire Agreement.  This Agreement (together with the exhibits hereto as such exhibits may be amended from time to time in accordance with this Agreement) constitutes the entire Agreement between Elo and Distributor with respect to the subject matter hereof. All prior or contemporary agreements, whether written or oral, and all proposals, understandings and communications between or involving Elo and Distributor are hereby canceled and superseded, except that this Agreement shall not relieve either party from making payments which may be due and owing under any agreement or contract made prior to the date hereof. This Agreement may be amended only by a writing executed by both parties.

9.02    CONTROLLING LAW; CONSENT TO JURISDICTION.  THIS AGREEMENT IS ENTERED INTO AND WILL BE DEEMED FOR ALL PURPOSES TO HAVE BEEN MADE IN FREMONT, CALIFORNIA, AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS AND AGREEMENTS MADE AND WHOLLY TO BE PERFORMED IN CALIFORNIA BY RESIDENTS OF CALIFORNIA. THE PARTIES AGREE THAT THE EXCLUSIVE JURISDICTION AND VENUE OF ANY ACTION WITH RESPECT TO THIS AGREEMENT SHALL BE IN THE SUPERIOR COURT OF

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

CALIFORNIA FOR THE COUNTY OF ALAMEDA OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, AND EACH OF THE PARTIES HEREBY SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS FOR PURPOSES OF SUCH ACTION.

9.03    Waiver.  Any waiver by either party to this Agreement of any provision of this Agreement shall not be construed as a waiver of any other provision of this Agreement, nor shall such waiver be construed as a waiver of such provision with respect to any other event or circumstance, whether past, present or future.

9.04    Severability.  If any provision of this Agreement is determined to be invalid or unenforceable in whole or in part, the remaining provisions shall be enforceable to the maximum extent possible.

9.05    Successors and Assigns.  This Agreement shall inure to the benefit of Elo and Elo's successors and assigns, and Elo may assign all or any portion of this Agreement and its duties hereunder.  Elo shall give Distributor written notice of any such assignment.  Distributor acknowledges that Elo has entered into this Agreement after consideration of the unique talents and experience of Distributor.  Because Elo has entered into this Agreement upon the basis of the particular abilities of Distributor, Distributor may not assign any of Distributor's rights or obligations under this Agreement without the prior written consent of Elo.  Any attempt by Distributor to assign this Agreement in contravention of this Section 9.05 shall be null and void. Any assignment or sale of a controlling interest in Distributor's business or more than twenty-five percent (25%) of the voting stock of a corporation owning such business shall be an assignment prohibited by this Section 9.05.

9.06    Change of Products.  Elo shall have the absolute right at any time and from time to time, upon thirty (30) days written notice to Distributor, to cease to manufacture and sell, or to change, modify or otherwise supersede, any and all Products.  Elo will accept for credit return of any Products in Distributor's inventory which have been purchased by Distributor from Elo within 30 days of such notice and which have been rendered unsaleable by such change.  Elo shall have no liability to Distributor with respect to any such change.  Distributor must provide Elo with written notice of its intent to return any Products in the event of any such Product change and of the quantity of such Products Distributor intends to return to Elo within thirty (30) days of Distributor's receipt of notification of any Product change from Elo.

9.07    Information.  Distributor shall provide Elo with Distributor's financial statements and a statement identifying direct or indirect ownership interests of Distributor on January 1 and July 1 of each year of this Agreement and as Elo may otherwise reasonably request.  Distributor also shall give Elo notice of any transfer of more than five percent (5%) of the ownership of Distributor.

9.08    Force Majeure.  Neither Elo nor Distributor shall be liable for its failure to perform its obligations under this Agreement due to events beyond its reasonable control

including, but not limited to, strikes, riots, wars, fire, acts of God, and acts in compliance with any applicable law, regulation, or order (whether valid or invalid) of any governmental body.

9.09   Use of Trademarks and Copyrighted Material. Distributor shall not use or permit to be used by any person any trademarks, service marks or trade names of Elo without Elo's prior written consent. Distributor shall not make any copies of Elo's copyrighted material including, but not limited to, any printed matter concerning any Product, without Elo's prior written consent.

9.10   No Conflict for Distributor. Distributor represents, warrants and agrees that Distributor is not and will not be a party to, or be bound by, any agreement or understanding, either oral or written, which conflicts with or purports to prohibit Distributor from entering into or performing any term or provision of this Agreement or selling Products or acting as Elo's distributor of Products to POS Purchasers.

9.11   Notices. Any notice contemplated by, or made pursuant to, this Agreement shall be in writing and shall be deemed delivered on the date of delivery if delivered personally, and three (3) days after mailing if placed in the United States mail, postage prepaid, addressed to Distributor or Elo, as the case may be, at the address shown at the beginning of this Agreement or such other address as shall be designated by at least ten (10) days prior written notice. A copy of any notice to ScanSource shall also be sent to 6 Logue Court, Suite G, Greenville, SC 29615. Attention: Buck Baker and a copy of any notice to Elo shall also be sent to: Raychem Corporation, 300 Constitution Drive, Menlo Park, CA 94025-1164, Attention: Legal Department, MS 120/8502.

9.12   Sales To The U.S. Government. In the event that Distributor sells Elo's products to or for known use by the U.S. Government, Distributor shall comply with all statutes and regulations governing sales to the U.S. Government. Elo makes no representations, certifications or warranties whatsoever with respect to the ability of its goods, services or prices to satisfy any such statutes, regulations or other requirements for sales to or for use by the U.S. Government except those which are expressly stated in the current Elo published product specifications or an express agreement reached with an authorized employee of Elo in connection with a particular sale for particular end use.

9.13   Compliance With Law. Distributor agrees to comply with all applicable laws, rules and regulations of any state or local jurisdiction and the United States of America and to do nothing to cause Elo to violate those laws, rules and regulations of the United States of America.

9.14   Attorneys' Fees. If legal action is commenced to enforce the performance of any part of this Agreement, the prevailing party shall be paid by the other party reasonable attorneys' fees and expenses.

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives and it will be effective as of the date first above written.

ELO TOUCHSYSTEMS, INC.                    SCANSOURCE, INC.

By: _Emily Liggett_                        By: _____

Its: _Emily Liggett, President_            Its: _President_

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

Exhibit A

**ELO TOUCHSYSTEMS**

# ScanSource Touchmonitor Pricing
## Effective July 1, 1998

**AccuTouch Touchmonitors**

| Size | Part Number | Description | Price |
|------|-------------|-------------|-------|
| 14" | P0144GN0 | AccuTouch, Clear. No drivers included. | ~~$375~~ 370 |
| | P0144G00 | AccuTouch, Internal Controller, Clear. No drivers included. | ~~$455~~ 410 |
| | P0144GN1 | AccuTouch, AntiGlare. No drivers included. | ~~$375~~ 370 |
| | P0144G01 | AccuTouch, Internal Controller, AntiGlare. No drivers included. | ~~$455~~ 410 |
| 15" | P05870N0 | AccuTouch, Clear. No drivers included. | $510 |
| | P0587000 | AccuTouch, Internal Controller, Clear. Win '95 driver included (008224-A). | $590 |
| | P05870N1 | AccuTouch, AntiGlare. No drivers included. | $510 |
| | P0587001 | AccuTouch, Internal Controller, AntiGlare. Win '95 driver included (008224-A). | $590 |
| 17" | P07870N0 | AccuTouch, Clear. No drivers included. | $860 |
| | P0787000 | AccuTouch, Internal Controller, Clear. Win '95 driver included (008224-A). | $940 |
| | P07870N1 | AccuTouch, AntiGlare. No drivers included. | $860 |
| | P0787001 | AccuTouch, Internal Controller, AntiGlare. Win '95 driver included (008224-A). | $940 |
| 12.1" | P0LCD101 | LCD, AccuTouch, Coach Chip, AntiGlare. Windows drivers included (3.1X, NT, 95), part numbers 008100-A, 008013-A, 008224-A. | $1,150 |
| Controllers | 002201-K1 | PC-Bus Controller, Cable | ~~$115~~ 100 |

Note: a Quickstart guide is packaged with each touchmonitor (Elo part number 008222).

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

IntelliTouch touchmonitors next page .......

**Exhibit A, cont.**

### IntelliTouch Touchmonitors

| Size | Part Number | Description | Price |
|------|-------------|-------------|-------|
| 14" | P2144G04 | IntelliTouch, Internal Controller, Anti-Glare, Win '95 Driver Included | $475 |
| | P2144G00 | IntelliTouch, Internal Controller, Clear, Win. 95 Driver Included | $470 |
| | P2144GN4 | IntelliTouch, AntiGlare | $375 |
| 15" | P2587004 | IntelliTouch, Internal Controller, AntiGlare, Win 95 Driver Included | $605 |
| | P2587000 | IntelliTouch, Internal Controller, Clear, Win '95 Driver Included | $600 |
| | P25870N4 | IntelliTouch, AntiGlare | $505 |
| | P25870N0 | IntelliTouch, Clear | $500 |
| 17" | P2787004 | IntelliTouch, Internal Controller, AntiGlare, Win '95 Driver Included | $990 |
| | P2787000 | IntelliTouch, Internal Controller, Clear, Win '95 Driver Included | $985 |
| | P278770N4 | IntelliTouch, AntiGlare | $890 |
| | P27870N0 | IntelliTouch, Clear | $885 |
| 14.0" | P2LCD14004 | IntelliTouch LCD, 2310MX Controller, AntiGlare, Includes Win 95 Driver | $2,200 |
| Controllers | 2856-35-K1 | PC-Bus Controller, Half-Slot, Cable | $150 |

Note: a Quickstart guide is packaged with each touchmonitor (Elo part number 008222).

### Miscellaneous Items:

| Drivers | 008100-A | DOS & Win 3.1X | No Charge |
|---------|----------|----------------|-----------|
| | 008015-A | MonitorMouse for MAC | No Charge |
| | 008013-A | NT Mouse Emulator | No Charge |
| | 008224-A | 95 Mouse Emulator | No Charge |
| Misc. | 510553 | VGA to MAC adapter | $20 |
| | 012261 | DB-9M — 8 pin Mini-Din for MAC | $9 |
| | 260115 | Control Panel Cover (Analog 14" TM) | $5 |

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

**EXHIBIT B**

I.    TERRITORY

The territory referred to in Section 1 shall be the following:

United States of America and Canada



Exhibit C

# TERMS AND CONDITIONS OF SALE

Except as otherwise agreed by Elo TouchSystems, Inc. ("Seller") in writing, the following terms and conditions will apply to all orders received and all sales made by Seller.

1. **GENERAL:** The terms and conditions set forth herein constitute the sole and entire agreement between Seller and the buyer ("Buyer") of goods and/or services from Seller with respect to the subject matter hereof. Any term or condition in any order, confirmation or other document furnished by Buyer which is in any way inconsistent with or in addition to the terms and conditions hereof is hereby expressly rejected, and Seller's acceptance of any offer or order of Buyer is hereby expressly made in reliance on Buyer's assent to all terms and conditions hereof. If Buyer objects to any of the terms or conditions hereof, such objection must be made in writing and received by Seller at Seller's stated address within ten (10) days after this document is transmitted to Buyer. Failure to so object shall be conclusively deemed to be acceptance of the terms and conditions hereof. Seller's failure to object to any term or condition in any oral or written communication from Buyer, whether delivered before or after the date hereof, shall not constitute an acceptance thereof or a waiver of any term or condition hereof. All correspondence pertaining to this order, or to any of the terms and conditions covered by this order, will be in the English language.

2. **TAXES:** The prices set forth herein are not subject to trade or other discounts and, except as otherwise expressly stated herein, do not include federal, state or local taxes applicable to goods or services involved in this transaction. All such taxes shall be paid by Buyer unless Buyer provides Seller with evidence satisfactory to Seller of exemption from such taxes. When Seller is required by law or regulation to collect such taxes, Seller will add such taxes to the sales price of the goods or services

3. **PRICES:** ~~covered by Cerstract~~ The sale price(s) for goods delivered hereunder ("Products") are accepted as stated on Seller's order acknowledgment and will include the cost of Seller's usual factory tests and inspections. All quotations of Seller are subject to change at any time prior to acceptance of an order and expire forty-five (45) days from the date given. All prices are subject to change without notice and may be subject to any increase which may be in effect on the date of shipment. Except as otherwise expressly stated herein, any service calls or other service work performed by Seller shall be at Buyer's expense in accordance with Seller's standard rates for such services. Buyer acknowledges that the pricing of the Products and services and the other terms of this Agreement have been set based on the foregoing sections of this Agreement providing for an agreed allocation of the risk for any defective Products or services between the parties. Buyer further acknowledges that the pricing and terms would have been different if there had been a different allocation of the risk.

4. **DELIVERY, TITLE PASSAGE AND INSURANCE:**

   **(a) Delivery.** Delivery or shipping dates, if any, set forth herein are approximate only and merely represent Seller's best estimate of the time required to make delivery or shipment. Time is not of the essence with respect to the transaction covered by these Terms and Conditions of Sale, except with respect to Buyer's obligation to make all related payments. Seller's obligations hereunder will be dependent upon Seller's ability to obtain the necessary raw materials. Seller will not be liable for any loss or expense (consequential or otherwise) incurred by Buyer as a result of any delay in delivery for any reason other than arbitrary refusal by Seller to perform. Seller reserves the right to make partial deliveries. Lead time on orders and rescheduling are governed by Seller's published policies as amended from time to time at Seller's discretion.

   **(b) Title Passage for Domestic Sales.** Except as otherwise expressly stated herein, all deliveries hereunder to destinations in the United States, Canada, or Mexico will be F.O.B. Seller's plant via a carrier selected by Buyer at its option, or otherwise by Seller, freight collect, to Buyer and will be packed in Seller's standard shipping packages. In all such cases title and risk of loss or damage will pass to Buyer upon Seller's delivery of the Products to the carrier for shipment to Buyer and no loss or damage will relieve Buyer of any obligation hereunder, including payment for lost or damaged Products. If shipment of any Product is delayed at Buyer's request, Seller may invoice Buyer for such Products, and risk of loss of such Products will pass to Buyer, on the date that Seller is prepared to make shipment to Buyer. Buyer shall reimburse Seller for any and all costs of storage incurred by Seller after the date that Seller is prepared to make shipment.

   **(c) Title Passage for Export Sales.** Except as otherwise expressly stated herein, all deliveries hereunder to destinations other than the United States, Canada or Mexico will be via a carrier selected by Buyer at its option, or otherwise by Seller, freight collect, to Buyer and will be packed in Seller's standard shipping packages. In all such cases (regardless of the designated F.O.B. point) title and risk of loss or damage will pass to Buyer on arrival of the Products at the port of entry, country of destination (but prior to unloading or customs inspection at such port), or the port of discharge outside the United States, or thirty (30) days from shipment, whichever first occurs. No loss or damage will relieve Buyer of any obligation hereunder, including payment for lost or damaged Products. All risks of transportation, prior to the passage of title, are for the account of Seller. Seller will have the exclusive right, as owner, to control the shipment, including the right to take possession of the Products from third parties, such as banks, transport



ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373



## TERMS AND CONDITIONS OF SALE

companies, or customs officials, or Buyer at any time and at any point up to the time that title passes to Buyer. Neither (i) the time, method, place or medium of payment provided for herein or any combination of the foregoing, nor (ii) the manner of consignment provided for, whether for or to the order of Buyer or its agent, will in any way limit or modify the rights of Seller, as the owner of the Products, to have control over and the right to possession of the Products until the title thereto passes to Buyer as provided for above. In the event that a bank has, by reason of credit extended to Buyer or for any other reason, an interest in the shipment, it is agreed that Seller may consign the Products to said bank through the usual channels; in each such case, the full right of ownership of and control over the shipment will remain in Seller until title passes to Buyer as provided herein. The terms "ownership" and "title" as used in these Terms and Conditions of Sale mean full beneficial ownership of the Products and not merely bare legal title retained for security purposes.

*Re Beaugonet is self-insured*  MM

(d) **Insurance.** Buyer will pay, or reimburse Seller for, all insurance on the Products. Any insurance proceeds collected by Buyer for Seller's account will be promptly remitted to Seller in U.S. Dollars. Any insurance policies purchased, whether by Buyer or Seller, will be for the benefit of Seller, whether or not Seller is named as an insured in such policies, until title and risk of loss or damage to the Products pass to Buyer. Where possible, all insurance policies will provide that they are for the benefit of Seller and Buyer "as their interests may appear."

5.  **BUYER'S CONDITION:** This agreement and all shipments made hereunder shall at all times be subject to the approval by Seller of Buyer's financial condition. If the financial condition of Buyer at any time becomes unsatisfactory to Seller, in Seller's sole discretion, or if Buyer fails to make any payment when due, in addition to any other rights Seller may have Seller may defer or decline to make any shipment or shipments hereunder or may condition any such shipment upon receipt of satisfactory security or cash payments in advance.

6.  ✓ **PAYMENT TERMS:** Except as otherwise expressly stated herein, Seller shall invoice Buyer at the time of shipment of each installment on payment terms of cash in advance, except where open account credit is established and maintained to Seller's satisfaction, in which case payment terms shall be one and one-half percent (1-1/2%) fifteen (15) days, net thirty (30) days from date of shipment. All payments shall be in U.S. Dollars. Buyer shall make all payments as provided herein without regard to whether Buyer has made or may make any inspection or use of any Products. Any invoiced amount which is not paid when due shall bear interest at the rate of one and one-half percent (1-1/2%) per month or the highest rate then permitted by law, whichever is less, until paid in full. Seller reserves the right to exercise any of its lawful remedies if Buyer does not make payments when due. Buyer shall promptly reimburse Seller for all costs and expenses, including reasonable attorneys' fees, incurred by Seller in collecting sums due it hereunder.

On orders for shipment to countries other than the U.S.A., payment on all sales will be made through the medium of a Letter of Credit to be established by Buyer at its expense including any bank confirmation charges. All Letters of Credit will be in favor of and acceptable to Seller, will be maintained in sufficient amounts and for the period necessary to meet all payment obligations, will be irrevocable and issued, or confirmed, by a bank in the U.S.A. satisfactory to Seller within fifteen (15) days after acceptance of any order, will permit partial deliveries and will provide for pro rata payments upon presentation of Seller's invoices and Seller's certificates of delivery F.O.B. Seller's factory, or of delivery into storage with certification of cause therefore, and for the payment of any termination charges.

7.  **SECURITY INTEREST:** Seller retains a security interest in all Products and all proceeds and products thereof until all amounts due or to become due hereunder have been paid. Any repossession and removal of Products shall be without prejudice to any of Seller's other remedies at law or in equity. Buyer agrees, without further consideration, at any time to do or cause to be done, executed and delivered, all such further acts and instruments (including without limitation financing statements appropriate for filing) as Seller may reasonably request in order to perfect Seller's security interest.

8.  **CONTINGENCIES:** Seller shall not be liable for delay in performance or nonperformance of any of its obligations hereunder, in whole or in part, if such performance is rendered impracticable by the occurrence of any contingency or condition beyond the control of either Seller or Seller's suppliers, including without limitation war, sabotage, embargo, riot or other civil commotion, failure or delay in transportation, act of any government or any court or administrative agency thereof (whether or not such action proves to be invalid), labor dispute (whether or not involving Seller's employees), accident, fire, explosion, flood or other casualty, shortage of labor, fuel, energy, raw materials or machinery or technical failure. If any such contingency or condition occurs, Seller may allocate production and deliveries in any reasonable manner and may include in such allocation any regular customers, whether or not then under contract, and Seller's own requirements. If, as a result of any such contingency, Seller's performance is delayed by more than six (6) months, the prices set forth herein shall be subject to appropriate adjustment by Seller.

Elo DualSource
EDC
Document Control


**TOUCHSYSTEMS**

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

## TERMS AND CONDITIONS OF SALE

**9.    LIMITED WARRANTY; SUITABILITY**

(a) Except as otherwise stated herein or in an order acknowledgment delivered to Buyer, Seller warrants to Buyer that the Products (x) shall be free of defects in materials and workmanship for the following periods (each a "Warranty Period") from date of shipment: five (5) years for AccuTouch touchscreens and controllers (except COACH chip controller); ten (10) years for IntelliTouch touchscreens and five (5) years for controllers; and for the period stated in the relevant specification sheet for TouchMonitors, and (y) shall be free of liens and encumbrances when shipped to Buyer. If Seller agrees in writing to provide and does provide system design, drawings, technical advice, or any other services to Buyer in connection with Products, then Seller further warrants to Buyer during the applicable Warranty Period that such services shall be undertaken in accordance with Seller's reasonable technical judgment based on Seller's understanding of pertinent technical data as of the date of performance of such services. Seller's warranties will not apply to any Product with respect to which there has been (i) improper installation or testing, (ii) failure to provide a suitable operating environment, (iii) use of the Product for purposes other than that for which it was designed, (iv) failure to monitor or operate the Product in accordance with applicable Seller specifications and good industry practice, (v) unauthorized attachment or removal or alteration of any part of the Product, (vi) unusual mechanical, physical or electrical stress, (vii) modifications or repairs done by other than Seller, or (viii) any other abuse, misuse, neglect or accident. In no circumstance shall Seller have any liability or obligation with respect to expenses, liabilities or losses associated with the installation or removal of any Product or the installation or removal of any components for inspection, testing or redesign occasioned by any defect or by repair or replacement of a Product.

(b) Seller makes no warranty regarding the model life of monitors. Seller's suppliers may at any time and from time to time make changes in the monitors delivered as Products or components.

(c) Buyer shall notify Seller in writing promptly (and in no case later than thirty (30) days after discovery) of the failure of any Product to conform to the warranty set forth above, shall describe in commercially reasonable detail in such notice the symptoms associated with such failure, and shall provide to Seller the opportunity to inspect such Products as installed, if possible. The notice must be received by Seller during the Warranty Period for such Product. Unless otherwise directed in writing by Seller, within thirty (30) days after submitting such notice, Buyer shall package the allegedly defective Product in its original shipping carton(s) or a functional equivalent and shall ship it to Seller at Buyer's expense and risk.

(d) Within a reasonable time after receipt of the allegedly defective Product and verification by Seller that the Product fails to meet the warranty set forth above, Seller shall correct such failure by, at Seller's option, either (i) modifying or repairing the Product or (ii) replacing the Product. Such modification, repair or replacement and the return shipment of the Product with minimum insurance to Buyer shall be at Seller's expense. Buyer shall bear the risk of loss or damage in transit, and may insure the Product. Buyer shall reimburse Seller for transportation costs incurred for Products returned but found by Seller not to be defective. Modification or repair of Products may, at Seller's option, take place either at Seller's facilities or at Buyer's premises. If Seller is unable to modify, repair or replace a Product to conform to the warranty set forth above, then Seller shall, at Seller's option, either refund to Buyer or credit to Buyer's account the purchase price of the Product less depreciation calculated on a straight-line basis over Seller's stated Warranty Period. THESE REMEDIES SHALL BE BUYER'S EXCLUSIVE REMEDIES FOR BREACH OF WARRANTY.

(e) EXCEPT FOR THE EXPRESS WARRANTY SET FORTH ABOVE, SELLER GRANTS NO OTHER WARRANTIES, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, REGARDING THE PRODUCTS, THEIR FITNESS FOR ANY PURPOSE, THEIR QUALITY, THEIR MERCHANTABILITY, THEIR NONINFRINGEMENT, OR OTHERWISE. NO EMPLOYEE OF SELLER OR ANY OTHER PARTY IS AUTHORIZED TO MAKE ANY WARRANTY FOR THE GOODS OTHER THAN THE WARRANTY SET FORTH HEREIN. SELLER'S LIABILITY UNDER THE WARRANTY SHALL BE LIMITED TO A REFUND OF THE PURCHASE PRICE OF THE PRODUCT. IN NO EVENT SHALL SELLER BE LIABLE FOR THE COST OF PROCUREMENT OR INSTALLATION OF SUBSTITUTE GOODS BY BUYER OR FOR ANY SPECIAL, CONSEQUENTIAL, INDIRECT OR INCIDENTAL DAMAGES.

(f) Buyer assumes the risk and agrees to indemnify Seller against and hold Seller harmless from all liability relating to (i) assessing the suitability for Buyer's intended use of the Products and of any system design or drawing and (ii) determining the compliance of Buyer's use of the Products with applicable laws, regulations, codes and standards. Buyer retains and accepts full responsibility for all warranty and other claims relating to, or arising from, Buyer's products which include or incorporate Products or components manufactured or supplied by Seller. Buyer is solely responsible for any and all representations and warranties regarding the Products made or authorized by Buyer. Buyer will indemnify Seller and hold Seller harmless from any liability, claims, loss, cost or expenses (including reasonable attorneys' fees) attributable to Buyer's products or representations or warranties concerning



ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373



## TERMS AND CONDITIONS OF SALE

same.

10.     **LIMITATION OF LIABILITY AND INDEMNITY:** Notwithstanding any other provision herein or in any other document or communication, (a) Seller's liability and obligations with respect to any claim(s) resulting or arising from or relating to this Agreement, whether in contract, strict liability, tort or otherwise, and even if Buyer's exclusive remedy fails of its essential purpose, shall in no event exceed in the aggregate the total purchase price received by Seller for the Products (or, in the case of obligations arising from or relating to particular Products or services rendered in connection herewith, the purchase price of such Products or amount received by Seller for such services, respectively), and (b) Seller shall in no event be liable to Buyer or any other person or entity, whether in contract, strict liability, tort or otherwise, for special, indirect or consequential damages of any kind whatsoever, or claims of any third parties. To expedite delivery of the Products ordered, Buyer agrees that it indemnifies and holds harmless Seller from and against all claims, loss, damage and liability, including without limitation for personal injury, property damage or commercial loss of whatever kind, directly or indirectly arising from or relating to the hazards inherent in Buyer's facilities or activities.

11.     **MEDICAL APPLICATIONS:** In connection any anticipated use of Products by Buyer in medical applications, Buyer acknowledges and agrees that:

(a) Seller's products are manufactured under normal industrial conditions, which may not satisfy the requirements applicable to products manufactured for certain medical applications. It is the sole responsibility of persons contemplating medical uses of Seller's products to comply with all applicable laws, regulations, codes and standards, including but not limited to the U.S. Federal Food, Drug and Cosmetic Act and regulations of the Food and Drug Administration. Seller's products have not been designed, manufactured, tested or qualified for use in certain medical applications (including life support systems) and Seller has not sought or received any rulings from the FDA or any other federal, state, or local government agency as to the safety, effectiveness or appropriateness of its products for such applications. Persons intending to evaluate or to use Seller's products for medical purposes must rely on their own medical and legal judgment without any representation on Seller's part.

(b) Buyer will indemnify, defend, and hold harmless Seller and its officers, directors, employees, agents, and contractors from and against any and all losses, claims, damages, liabilities, and expenses (including reasonable attorneys fees) arising out of or based upon any bodily injury or property damage arising from Buyer's incorporation of Products as part of any Product made by Buyer for medical applications, including without limitation cardiac pacemakers, defibrillators, electrodes, leads, and programmers, and components therefor. Seller shall give Buyer written notice of any such claim and shall cooperate in the defense of such claim at Buyer's expense.

12.     **ACCEPTANCE; RETURNS:** Buyer shall inspect Products promptly upon their receipt. Unless Buyer notifies Seller in writing within seven (7) days after the receipt of Products or the rendering of services that the Products or services are nonconforming, describing the nonconformity in commercially reasonable detail, Buyer shall be deemed to have accepted the Products or services. Buyer may not revoke its acceptance of Products or services and shall be barred from any remedy unless Buyer notifies Seller in writing within thirty (30) days of receipt of Products or rendering of services that the Products or services are nonconforming, describing the nonconformity in commercially reasonable detail, and that Buyer considers Seller in breach. Acceptance as aforesaid shall constitute acknowledgment of full performance by Seller of all its obligations hereunder. No Products delivered and accepted under this Agreement are subject to returns except upon (a) written approval of Seller and (b) payment of a fair and equitable restocking charge as determined by Seller's restocking charge policy at the time of return.

13.     **PATENTS:** Seller agrees to settle or defend any suit or proceeding brought against Buyer insofar as such suit or proceeding is based on a claim that any Product constitutes direct infringement of any issued United States patent. Seller shall pay all damages and costs finally awarded therein against Buyer, provided Seller is informed by Buyer in writing within ten (10) days after receipt by Buyer and furnished a copy of each communication, notice or other action relating to the alleged infringement and is given all authority (including the right to exclusive control of the defense of any suit or proceeding), information and assistance necessary to settle or defend such suit or proceeding. In the event such Product or any part thereof is, in such suit, held to constitute infringement and the use of such Product or part thereof is enjoined, Seller shall, by its own election and at its own expense, either (a) procure for Buyer the right to continue using such Product, or modify it so that is becomes non-infringing or (b) remove such Product, or part thereof, and grant Buyer a credit thereon and accept its return. Seller shall not be obligated to settle or defend any suit or proceeding, or be liable for any costs or damages, if the alleged infringement arises out of compliance with Buyer's specifications or any addition to or modification of the Product after delivery thereof or from use of the Product or any part thereof in conjunction with other goods or in the practice of a process. Seller's obligations hereunder shall not apply to any alleged infringement occurring after Buyer has received notice of such alleged infringement unless Seller thereafter gives Buyer express



ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

## TERMS AND CONDITIONS OF SALE

written consent for such continuing alleged infringement. Seller shall not be bound in any manner by any settlement hereunder made without its prior express written consent, nor shall Seller be liable for any incidental or consequential damages arising out of patent infringement. Seller's liability hereunder shall not exceed the purchase price paid by Buyer for the allegedly infringing Product. If infringement is alleged prior to completion of delivery of a Product, Seller may decline to make further shipments without being in breach of this Agreement. THE FOREGOING STATES THE SOLE AND EXCLUSIVE LIABILITY OF SELLER FOR PATENT INFRINGEMENT AND IS IN LIEU OF ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, IN REGARD THERETO. Buyer agrees, at its expense, to settle or defend and to pay costs and damages finally awarded in any suit or proceeding against Seller based on an allegation that any Product furnished hereunder according to designs or specifications furnished by Buyer infringe any patent, provided Buyer is promptly notified in writing of such suit or proceeding and is given all authority (including the right to exclusive control of the defense of any suit or proceeding), information and assistance necessary to defend or settle any such suit or proceeding.

14. **PROPERTY FURNISHED BY BUYER:** If Buyer furnishes any monitors or other components, tools, dies, jigs or other property or facilities to Seller in connection with the performance of this Agreement, Buyer shall bear all risk of loss or damage with respect to such property or facilities and shall indemnify and hold Seller harmless from and against all loss, cost, expense or liability arising in connection with its use of any such property or facilities. Seller shall not be responsible for any delay in performance or nonperformance hereunder or the failure of any Product to conform to applicable specifications resulting, in whole or in part, from Seller's use of property or facilities furnished by Buyer.

15. **PROPRIETARY INFORMATION:** As used herein, the term "Proprietary Information" includes any information of a confidential or proprietary nature obtained from Seller and any information obtained from Seller which is not readily available to Seller's competitors and which, if known by a competitor of Seller, might lessen any competitive advantage of Seller or give such competitor a competitive advantage. Seller retains ownership of all Proprietary Information and all documentation which contains Proprietary Information. Buyer shall not disclose, duplicate or reproduce any Proprietary Information nor shall Buyer use any Proprietary Information other than in the course of performing its obligations hereunder. Buyer shall take all reasonable steps to prevent the disclosure, duplication or reproduction of any Proprietary Information. Notwithstanding the foregoing, Buyer shall not be required to refrain from disclosing or using any Proprietary Information which has become known to Buyer if the original source of such Proprietary Information was not Seller or any person or party affiliated with Seller or having a relationship of confidentiality with or an obligation of confidentiality to Seller.

16. **CANCELLATION:** Neither this Agreement nor any release hereunder is subject to cancellation by Buyer except upon (a) written request of Buyer, (b) written approval of Seller, and (c) the payment to Seller of a fair and equitable cancellation charge. Because Seller's expenses related to canceling firm orders are dependent upon (i) Seller's inventory carrying costs, (ii) the likelihood of Seller quickly selling the subject Products to other buyers, (iii) Seller's other related out-of-pocket costs, and (iv) administrative costs, the amount of cancellation charge Buyer shall pay to Seller will be determined solely by Seller.

**CANCELLATION OF STANDARD PRODUCT:** If Seller determines the Product being canceled to be Standard Product, the amount of the cancellation charge will vary according to the (a) quantity being canceled, (b) time frame between Buyer's request to Seller to cancel and the order's scheduled ship date, and (c) dollar amount of order being canceled. The calculation of the exact cancellation charge will be governed by Seller's published policies as amended from time to time at Seller's discretion. In no case will be cancellation charge be less than thirty percent (30%) of the original agreed upon purchase price.

**CANCELLATION OF CUSTOM PRODUCTS:** If Seller determines the Product being canceled to be Custom Product, Buyer agrees to pay Seller for all of Seller's out of pocket costs associated with the cancellation of the order including, but not limited to: (i) raw materials, (ii) work in process, (iii) inventory carrying costs, (iv) scrapping and disposal fees, and (v) a reasonable and equitable profit for Seller, which shall not be less than twenty percent (20%) of such costs. In no case will the cancellation charge be less than Seller's actual costs (including overhead and other indirect costs). The amount of cancellation charge to be charged to Buyer shall be determined at the sole discretion of Seller and may equal 100% of the amount of the order at the time of Seller's receipt of Buyer's request for cancellation. Buyer is entitled to receive a written notice from Seller setting forth how the cancellation charge was calculated. Upon payment of the cancellation charge, Buyer shall be entitled to receive all raw materials and work in process, and Seller agrees to ship such goods to Buyer at Buyer's expense.

Seller reserves the right, by written notice of default, to cancel any order, without liability to Buyer, in the event of the happening of any of the following: insolvency of Buyer, the filing of a voluntary petition in bankruptcy by Buyer, the filing of an involuntary petition to have Buyer declared bankrupt, the appointment of a receiver or trustee for Buyer, the execution by Buyer of an assignment for the benefit of creditors, the discontinuance of business by Buyer, or the sale by Buyer of the bulk of its assets other

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373



## TERMS AND CONDITIONS OF SALE

than in the usual course of business.

17. **RESALE OF COMPONENT PRODUCTS:** Buyer agrees that it shall not resell any component Products purchased from Seller unless Buyer is an authorized distributor of Seller's products. Seller shall not be obligated to provide any warranty service or other technical support for any component Products not purchased directly from Seller or an authorized distributor of Seller.

18. **NO LICENSE:** Neither this Agreement nor any purchase of Products hereunder shall be construed to confer upon Buyer or its customers any license under any patent or other proprietary rights of Seller, except the right to use such goods for the purposes for which they are sold.

19. **NON-WAIVER OF DEFAULT:** No failure by Seller to insist on strict performance of any term or condition hereof shall constitute a waiver of such term or condition or any breach thereof, nor shall such failure in any way affect Seller's legal remedies with respect to any default by Buyer hereunder.

20. **APPLICABLE LAW:** This Agreement shall be governed by and construed in accordance with the laws of the State of California, USA, excluding laws directing the application of the laws of another jurisdiction.

21. **ASSIGNMENT:** Buyer may not transfer or assign this Agreement or any interest herein, by operation of law or otherwise, without the prior express written consent of Seller. Any attempted transfer or assignment without such consent shall be void. Seller may assign its rights and delegate its duties hereunder.

22. **ENTIRE AGREEMENT; MODIFICATION:** This Agreement supersedes all prior written and oral agreements and understandings between Seller and Buyer with respect to the Products and services specified herein. No representation or statement not contained herein shall be binding upon Seller as a warranty or otherwise. No addition to or waiver, modification or cancellation of any provision hereof shall be binding upon Seller unless in writing and signed by a duly authorized representative of Seller.

23. **NOTICES:** All notices and other communications hereunder shall be in writing and shall be mailed by first-class, registered or certified mail, postage prepaid, to the parties hereto at their respective designated addresses, subject to the right of either party to change such address upon ten (10) days' prior written notice.



ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

**EXHIBIT D**

## STOCK ROTATION POLICY

All Product returns are subject to the following conditions:

(I)      The Products have been stored under conditions which have not adversely affected any Product properties.

(II)     All Products sought to be returned have been purchased directly from Elo by Distributor.

(III)    Before Products may be returned to Elo for credit, a return authorization number must be issued to Distributor by Elo.

(IV)    Returned Products must be received by Elo (freight prepaid) within thirty (30) days of the related authorization being issued by Elo to the Distributor. Products must be returned to Fremont, California.

(V)     The Stock Rotation Policy applies to Products with active (not obsolete) part numbers only.

(VI)    The value of returned Products shall not exceed fifteen percent (15%) of the Distributor's total purchases for each fiscal quarter. Products shall not qualify for rotation if the Product(s) are past (12) months from date of Purchase.

(VII)   The return shall be accompanied by a new purchase order for an equivalent dollar value of Product.

(VIII)  Only unopened standard packages with an original Elo product label will be accepted for return. All Products must be returned in a clean, well-packaged condition. A detailed packing list must be enclosed indicating the return authorization number and quantity of each item.

(IX)    Credit will not be issued for items returned to Elo which do not meet this policy. The Distributor will be given the opportunity to have the product returned at Distributor's shipping cost or the product will be scrapped by Elo without credit being issued to the Distributor.

# EXHIBIT C

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373



Dutchie, LLC

2728 NW Potts Ct, Ste 100 Bend, OR 97703

Seller:
Address:

Scansource

6 Logue Ct Greenville, SC 29615

PO Number
Purchase Date
Payment Terms
Inco Terms
Ship To Location
Delivery Instructi

| Line | Manufacturer | Part Number | Part Description | Product | Unit Price | QTY | Extended Price |
|------|-------------|-------------|-----------------|---------|-----------|-----|----------------|
| 1 | ELO | E375184 | Elo 15" v4 Slate & Z30 No CFD - Dutchie Branded | Terminal | $622.92 | 20000 | $12,458,333. |
| 2 | ELO | E466379 | Custom 1002L CFD + Wedge Stand:E466379 ET1002L-2UWC-1-RCTS | CFD | $300.00 | 15000 | $4,500,000. |

|  | Total | $16,958,333. |
|--|-------|--------------|
|  | Sales Tax | |
|  | Total | $16,958,333. |

**Notes:**

ELO Quote Q15669

Unit Price is a cost Plus structure of 4% gross margin. Dutchie branded Products will be non-cancellable.

For clarity sake, payment terms will trigger when Product is shipped to end customer. Each unique shipment will trigger payment terms for the value of the goods shipped to the end customer.

Part number and Unit Price for line 2 to be added

Invoices to be sent to:　　　　ap@Dutchie.com

# EXHIBIT D

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

DocuSign Envelope ID: 5773F740-EA24-4033-82C6-510695549B34

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

## FIRST SUPPLEMENT TO CUSTOMER AGREEMENT

This Supplement to Customer Agreement ("this Supplement") is entered into by and between Courier Plus, Inc. ("Dutchie"), with its principal offices located at 2728 NW Potts Ct. Suite 100, Bend, MA 97703, and ScanSource, Inc., including its Canada and United States subsidiaries and affiliates ("ScanSource") with its principal offices located at 6 Logue Ct., Greenville, SC 29615, (collectively Dutchie and ScanSource referred to as "the Parties"), effective on the last date signed by an authorized representative below ("Effective Date").

WHEREAS, the Parties entered into an agreement for the sale of Products when Dutchie executed ScanSource's standard terms and conditions of sale on September 28, 2021 ("Customer Agreement") and also accompany (and are incorporated by reference into) invoices sent by ScanSource;

WHEREAS, the Parties desire to enter into this Supplement in order to amend and supplement the Customer Agreement for the purchase by Dutchie from ScanSource of ELO Touch Solutions, Inc. ("ELO") Products ("ELO Products"), but only to the extent ScanSource is permitted by ELO to sell ELO Products to Dutchie, and only to the extent that, at ScanSource's sole discretion, ELO and Dutchie have complied with ScanSource's conditions for selling ELO Products;

NOW THEREFORE, for good and valuable consideration, and in consideration of the mutual covenants and conditions herein set forth, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  Scope of Supplement.
The terms and conditions of the Customer Agreement are hereby incorporated by reference and shall govern the conduct of business as between ScanSource and Dutchie; provided, however, the modifications to the Customer Agreement under this Supplement shall only apply to the sale of ELO Products by ScanSource to Dutchie. In the event of a conflict between this Supplement and the Customer Agreement, this Supplement shall control. All other terms in the Customer Agreement will apply to purchases under this Supplement and shall apply to this Supplement generally. Nothing in this Supplement will limit any rights or remedies held by ScanSource in the Customer Agreement, including its application for sales under this Supplement.

2. Dutchie Branded ELO Product Inventory.
2.1 Forecasts. On a monthly basis, Dutchie shall provide ScanSource rolling monthly product forecasts, or the Parties shall schedule monthly forecasting calls.

2.2 Stocking. ScanSource shall place, after ScanSource and Dutchie mutually agree in writing to accepting a purchase order, which will be governed by the Customer Agreement, submitted by Dutchie to ScanSource for ELO Products based on the monthly forecast("Purchase Order"), purchase orders to ELO that corresponds with the Purchase Orders.

DocuSign Envelope ID: 5773F740-EA24-4033-82C6-510695549B34

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

2.3 Inventory Reports.  ScanSource shall provide, in a reasonable time frame, not to exceed two (2) business days, Dutchie a real time inventory report of all applicable Dutchie branded ELO Products.

2.4 Purchase of Inventory.  Dutchie commits to purchase stock of all branded ELO Products that have been (i) ordered by ScanSource from ELO based on Dutchie's monthly forecasts and (ii) held in inventory by ScanSource for longer than ninety (90) days as evidenced by ScanSource's inventory reports ("Excess Inventory").  In the case of the sale of Excess Inventory under this Section, which shall immediately occur upon notice from ScanSource to Dutchie, Dutchie's purchase price of such units of Excess Inventory shall be the price of the same ELO Products per unit, in the most recent invoice of the date ScanSource provides notice, and payment shall be immediately due upon date of such notice. At the time of the purchase of ELO Products under this Section, Dutchie agrees to execute an agreement substantially in the form of a product storage agreement that ScanSource as set forth in Exhibit A (the "Product Storage Agreement") and ScanSource shall have no liability for ELO Product purchased under this Section.

3.    Term and Termination.

The term of this Supplement (the "Term") shall commence on the Effective Date and continue initially for one (1) year, after which the Term shall automatically renew for successive one-year periods unless either Party delivers notice to the other Party (no less than thirty 30) days prior to the then-current anniversary of the Effective Date) of its election to not renew, and terminate, this Supplement. Additionally, either party may terminate this Supplement at any time and for any reason upon no less than six (6) months prior written notice. Either Party  may immediately terminate this Supplement if the other party  materially breaches any obligation in this Supplement or in the Customer Agreement and is unable to cure such breach within sixty (60) days of written notice from the non-breaching Party. There shall be no cure period for any breach based on any payment obligations, for which the non-breaching Party may immediately terminate this Supplement. In connection with any such termination, Dutchie shall purchase all ELO Products ordered by ScanSource in accordance with Dutchie's Purchase Order and forecast to ScanSource, and not yet delivered by ELO and all ELO Products still in ScanSource's possession or returned to ScanSource within forty-five (45) days after the date of termination. Dutchie shall make payment to ScanSource within net sixty  (60) days of termination, provided that ScanSource provides Dutchie with a list of ELO Products subject to repurchase ("Products List") within twenty (20) days of termination which Dutchie shall accept as accurate and agrees to immediate delivery of the ELO Products on the Products List. ScanSource may update the Products List within forty-five (45) days after termination and Dutchie shall be liable for any additional amounts owed within thirty (30) days after being notified of the supplemented Product List. This provision shall survive termination of the Supplement.

DocuSign Envelope ID: 5773F740-EA24-4033-82C6-510695549B34

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

4.    Conditions.

Dutchie warrants and represents that it understands all purchase orders under this Supplement which Dutchie submits to ScanSource shall be non-returnable, non-modifiable, and non-cancelable.

5.    Force Majeure.

If the performance of this Supplement, or any obligations hereunder, is prevented, restricted, or interfered due to circumstances beyond its reasonable control, including but not limited to, fire, strikes; power; declarations of war any governmental action; the affected party, upon giving prompt notice to the other party, will be excused from performance to the extent of the prevention, restriction, or interference, provided that the affected party uses its best efforts to avoid or remove the causes of non-performance and continues performance hereunder with the utmost dispatch whenever those causes are removed.

6.    No Other Changes.
Except as expressly modified by the terms of this Supplement with respect to purchase and sale of the ELO Products, the terms of the Customer Agreement are hereby ratified and confirmed and remain In full force and effect. Capitalized terms in this Supplement shall have the same meaning as those terms have In the Customer Agreement unless otherwise defined herein.

7.    Limitation of Liability.

IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL, INDIRECT OR PUNITIVE DAMAGES OF ANY KIND OR NATURE ALLEGED TO HAVE ARISED OUT OF OR IN RELATION TO THIS SUPPLEMENT. THIS INCLUDES, BUT IS NOT LIMITED, TO ANY DAMAGES CLAIMED FOR DELAYS IN SHIPMENT, LOSS OF PROFITS OR BUSINESS, OR OTHER SIMILAR CLAIMS. NOTWITHSTANDING ANY OTHER TERMS OR CONDITIONS TO THE CONTRARY, EXCEPT FOR INDEMNIFICATION OBLIGATIONS SET FORTH IN THE CUSTOMER AGREEEMENT OR OTHER AGREEMENTS, EACH PARTY'S LIABILITY UNDER THIS SUPPLEMENT SHALL NOT EXCEED THE PURCHASE PRICE OF THE ELO PRODUCTS PAID TO SCANSOURCE BY DUTCHIE AND ANY ACCRUED INTEREST THAT GIVING RISE TO THE ALLEGED LIABILITY. THIS SECTION IS IN ADDITION TO AND NOT IN REPLACEMENT OF THE LIMITATION OF LIABLITY IN THE CUSTOMER AGREEMENT.

**Signature Page to Follow**

DocuSign Envelope ID: 5773F740-EA24-4033-82C6-510695549B34

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

IN WITNESS WHEREOF, the Parties have executed this Supplement as of the Effective Date defined above.

**Agreed To:**

ScanSource, Inc.

By: _Justin Price, VP Sales_

Authorized Representative

Date: _12/17/2021_

Dutchie, Inc.

Ross Lipson

By: Ross Lipson

Authorized Representative

Date: 12/16/2021

DocuSign Envelope ID: 5773F740-EA24-4033-82C6-510695549B34

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

## Exhibit A

**PRODUCT STORAGE AGREEMENT**

This Product Storage Agreement ("this Agreement") is between _____ ("Reseller") and ScanSource, Inc. and it affiliates and subsidiaries ("ScanSource") and is effective as of this _day of _____.

**WHEREAS,** ScanSource has a business relationship with Reseller pursuant to ScanSource's standard terms and conditions of sale ("ScanSource's T's and C's");

**WHEREAS,** Reseller desires for ScanSource to store and invoice products it has purchased from ScanSource ("Bill and Hold Products" or "BH Products") or desires for ScanSource to store products owned by Reseller ("Customer Owned Products" or "CO Products") (collectively "CO Products" and "BH Products" referred to as "Products") in ScanSource's warehouse for a period of time; and

**NOW THEREFORE,** for good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties agree as follows:

(1) Title and ownership transfer of BH Products moves to the Reseller at the time of invoicing.  In the case of CO Products, title and ownership belongs to the Reseller at all times, including storage at ScanSource's facilities.   Reseller agrees to remain in full compliance with all of the other standard ScanSource's T's and C's, including but not limited to all payment obligations, and Reseller agrees that ScanSource's T's and C's will remain in full force and effect for all Products while Products are located in a ScanSource warehouse or while such Products are under the direction and control of ScanSource, and that this Agreement shall be subject to the same payment, notice, indemnity, and compliance provisions as contained in ScanSource's T's and C's.

(2) Reseller agrees to fill out a Storage Order Form for all Products that Reseller wishes for ScanSource to store in ScanSource's warehouse, a copy of which is attached hereto as Exhibit 1 for BH Products and Exhibit 2 for CO Products and incorporated herein by reference.

DocuSign Envelope ID: 5773F740-EA24-4033-82C6-510695549B34

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

(3) Reseller may elect to purchase insurance from ScanSource for the Products while they are located on ScanSource's premises. If the customer elects to purchase insurance from ScanSource, ScanSource agrees to bear the risk of loss for physical loss or damage to the Products that may occur while stored at ScanSource's warehouse. All insurance charges will be included in Exhibit 1 for BH Products and Exhibit 2 for CO Products.

(4) Reseller agrees to pay all warehousing (i.e. receiving, handling, re-labeling, etc.), shipping and insurance fees ("Storage Fees") as defined in Exhibit 1 for BH Products and Exhibit 2 for CO Products. For BH Products, Reseller also agrees to make the payments owed for purchase of the BH Products. All sales of Products and services are made subject to ScanSource's T's and C's.

(5) Reseller agrees that ScanSource shall only be obligated to hold the Products for the time period defined in Exhibit 1 for BH Products and Exhibit 2 for CO Products.

(6) At the end of the Storage Period Reseller may request the Products remain in ScanSource's warehouse, or, at Reseller's cost, that they be shipped to Reseller's customer or Reseller's warehouse. ScanSource will not be obligated to hold the Products for longer than the Storage Period and Reseller understands that Storage Fees may increase if Reseller requests that ScanSource store the Products for a term longer than the Storage Period. Reseller agrees to execute a new Exhibit 1 for BH Products and Exhibit 2 for CO Products upon ScanSource's request, if Reseller requests that ScanSource store the Products for longer than the Storage Period.

Product to be released from storage can only be released by an authorized Reseller representative and that release authorization must be provided in writing. E-mailed release authorizations are acceptable. The release must contain Product to ship, shipping address, contact information for the delivery site including an individual's name, phone number, shipping method, and any special requirements about the delivery location, i.e. loading dock capabilities, lift gate requirements, special delivery times and/or clearances.

(7) In the event that Reseller refuses or fails to sign a new Exhibit 1 for BH Products and Exhibit 2 for CO Products, ScanSource reserves the right to ship Products to Reseller's warehouse as defined in Exhibit 1 for BH Products and Exhibit 2 for CO Products. Further, in the event that Reseller fails to execute a new Exhibit 1 for BH Products and Exhibit 2 for CO Products and requests that ScanSource continue to hold the Products for longer than the Storage Period, Reseller recognizes that ScanSource would incur costs associated with such incremental Product Storage, and has the right to bill Reseller for such costs.

DocuSign Envelope ID: 5773F740-EA24-4033-82C6-510695549B34

(8) This Agreement shall remain in full force and effect for so long as ScanSource is storing Products. Either party may terminate this Agreement immediately for cause upon ten (10) days written notice. Either party may terminate this Agreement for convenience upon thirty (30) days written notice. Upon any termination of this Agreement, provided that Reseller has paid for BH Products and otherwise complied with ScanSource's T's and C's, ScanSource shall return to Reseller, at Reseller's expense, any Products in ScanSource's possession. ScanSource shall retain the right to recover all accrued Storage Fees owed by Reseller as of the effective date of termination, and Reseller agrees to pay any such Storage Fees without deduction or set-off of any amount.

(9) Any damaged, DOA or missing Products that are identified at ScanSource's warehouse at the commencement of the storage period will be reported to Reseller. Damaged or DOA product will be returned to the reseller at Reseller's expense.

(10) RESELLER ACKNOWLEDGES THAT SCANSOURCE IS NOT THE MANUFACTURER OF PRODUCTS AND THAT SCANSOURCE IS NOT THE AGENT OF THE MANUFACTURER. SCANSOURCE EXPRESSLY DISCLAIMS ALL WARRANTIES OF ANY KIND, NATURE OR DESCRIPTION (WHETHER ORAL, WRITTEN, EXPRESS OR IMPLIED) IN RELATION TO THIS AGREEMENT.

(11) This agreement along with ScanSource's T's and C's contains the complete statement of the terms for storage, warehousing and inventorying of Products. This agreement may not be changed, modified or amended except by an instrument in writing signed by both parties. Each party has had an opportunity to have this Agreement reviewed by counsel and the parties agree the normal rule of construction governing ambiguities favoring the non-drafting party over the drafting party shall not apply. This agreement shall be construed and enforced in accordance with the laws of South Carolina without regard to the conflicts of law provisions thereof. All claims, actions, disputes, controversies or suits shall be litigated exclusively in the courts of Greenville County, South Carolina. If any section, term, condition or portion of this agreement shall be found to be illegal or void as being against public policy, it shall be stricken and the remainder of this document shall stand as the original. A waiver by ScanSource of any term, condition or agreements to be performed by Reseller or any breach thereof shall not be construed to be a waiver of any succeeding breach thereof or of any other term, condition or agreement herein contained.

(12) **IN NO EVENT SHALL SCANSOURCE, ITS AFFILIATES, OR THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, SHAREHOLDERS,**

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

DocuSign Envelope ID: 5773F740-EA24-4033-82C6-510695549B34

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

**MEMBERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS, BE LIABLE TO RESELLER OR ANY THIRD PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES OF ANY KIND (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, BUSINESS INTERRUPTION, LOSS OF DATA, LOSS OF BUSINESS INFORMATION, ATTORNEYS' FEES, AND THE LIKE) ARISING UNDER THIS AGREEMENT OR OTHERWISE, WHETHER IN AN ACTION BASED ON BREACH OF WARRANTY (EXPRESS OR IMPLIED), BREACH OF CONTRACT, STRICT TORT LIABILITY OR OTHERWISE, EVEN IF SCANSOURCE HAS BEEN ADVISED OF THE POSSIBILITY OR LIKELIHOOD THEREOF. THE TOTAL CUMULATIVE LIABILITY OF SCANSOURCE HEREUNDER, IF ANY, SHALL IN NO EVENT EXCEED THE TOTAL AMOUNT PAID TO SCANSOURCE BY RESELLER HEREUNDER.**

By signature below, Reseller agrees to having read the above and understands the requirements and processes for storage solutions through ScanSource. These are in addition to the terms and conditions of ScanSource's purchase order, which are incorporated herein by reference. Reseller also acknowledges that it has the authority to enter into this Agreement and the signatory for Reseller is acting on behalf of Reseller.

| **ScanSource** | **Reseller** |
|---|---|
| By: | By: *Ross Lipson* <br> 9D07F8AFC8D24F9... |
| Name: | Name: Ross Lipson |
| Title: | Title: CEO |
| Date: | Date: 12/16/2021 |

DocuSign Envelope ID: 5773F740-EA24-4033-82C6-510695549B34

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

**EXHIBIT 1**

**BH (BILL AND HOLD) PRODUCTS STORAGE ORDER FORM**

**1. BH PRODUCTS:**  Reseller desires for ScanSource to bill and hold the following Products in ScanSource's warehouse:   (please specify the number of Products and type of Products. Reseller may reference a purchase order if Reseller intends for a products from the purchase order to be warehoused by ScanSource.)

**2. STORAGE PERIOD:**  The parties agree BH Products will be held in ScanSource's warehouse from the date of invoice until: _____ (Month/Day/Year).

**3. STORAGE FEES:**  Reseller agrees to pay the following storage fees during the Storage Period, and such fees shall be added to Reseller's invoice:

**Warehousing Fees:  $_____**

**Insurance:**        $_____

**Shipping:**         $_____

**Total:**            $_____

**4.     RESELLER'S WAREHOUSE:**  Upon expiration of the Storage Period, Reseller agrees that if Reseller has neither requested that ScanSource deliver BH Products to Reseller's customer nor requested to extend the Storage Period, ScanSource will deliver BH Products to Reseller's warehouse located at:

Street:                _____

DocuSign Envelope ID: 5773F740-EA24-4033-82C6-510695549B34

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

City, State, Zipcode: _____

5.     The parties agree and understand the BH Products on this Storage Order Form are subject to ScanSource's standard terms and conditions of purchase and the Bill and Hold Product Agreement executed by the parties.

**ScanSource**                                    **Reseller**

By: _____           By: _____
                                                       *Ross Lipson*

Name: _JUSTIN PRICE_                   Name: Ross Lipson
                                                       _____

Title: _VP, SALES_                          Title: CEO
                                                       _____

Date: _12/17/2021_                          Date: 12/16/2021
                                                       _____

DocuSign Envelope ID: 5773F740-EA24-4033-82C6-510695549B34

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

**EXHIBIT 2**

**CO (CUSTOMER OWNED) PRODUCTS STORAGE ORDER FORM**

**1. CO PRODUCTS:** Reseller desires for ScanSource to hold the following Products in ScanSource's warehouse:  (please specify the number of Products and type of Products. Reseller may reference a purchase order if Reseller intends for products from the purchase order to be warehoused by ScanSource.)

| ScanSource Item | Vendor Item | Quantity | Reseller Purchase Order Number (if applicable) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

DocuSign Envelope ID: 5773F740-EA24-4033-82C6-510695549B34

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

**2.     STORAGE PERIOD:**  The parties agree CO Products will be held in ScanSource's warehouse from the date of invoice until: _____ (Month/Day/Year).

**3.     STORAGE FEES:**   Reseller agrees to pay the following storage fees during the Storage Period, and such fees shall be added to Reseller's invoice:

**Warehousing Fees:**   $_____

**Insurance:**        $_____

**Shipping:**         $_____

**Total:**           $_____

**4.     RESELLER'S WAREHOUSE:**  Upon expiration of the Storage Period, Reseller agrees that if Reseller has neither requested that ScanSource deliver CO Products to Reseller's customer nor requested to extend the Storage Period, ScanSource will deliver CO Products to Reseller's warehouse located at:

Street:            _____

City, State, Zipcode:  _____

**5.**     The parties agree and understand the CO Products on this Storage Order Form are subject to ScanSource's standard terms and conditions of purchase and the Customer Owned Product Storage Agreement executed by the parties.

**ScanSource**                          **Reseller**

By: _____     By:  _Ross Lipson_
                                         DocuSigned by:
                                         9D07FBAFCBD24F9...

DocuSign Envelope ID: 5773F740-EA24-4033-82C6-510695549B34

Name: _Justin Price_          Name:   Ross Lipson
_____          _____

Title: _VP, Sales_               Title:   CEO
_____          _____

Date: _12/17/2021_               Date:   12/16/2021
_____          _____

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

# EXHIBIT E

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373

**Dutchie, LLC**
2728 NW Potts Ct, Ste 100 Bend, OR 97703

| Seller: | Scansource |
|---|---|
| Address: | 6650 Commerce Drive Suite 100 Southaven, MS 38671 |

| PO Number | ELO JAN 2023 |
|---|---|
| Purchase Date | 5/5/2022 |
| Payment Terms | Net 60 from shipment to customer |
| Inco Terms | DAP - Customer Location |
| Ship To Location | 6650 Commerce Drive Suite 100 Southaven, MS 38671 |
| Delivery Instruction | Per individual call off schedule |

| Line | Manufacturer | Part Number | Part Description | Product | Unit Price | QTY | Extended Price | Delivery Date |
|---|---|---|---|---|---|---|---|---|
| 1 | ELO | E375184 | Elo 15" x4 Suite & Z30 No CFD - Dutchie Branded | Terminal | $622.92 | 1,000 | $622,920.00 | Immediate |
| 2 | ELO | E466379 | 1002L - Counter CFD (non branded) | CFD | $300.00 | 1,000 | $300,000.00 | Immediate |
| | | | | | | Total | $622,920.00 | |
| | | | | | | Sales Tax | $46,719.00 | |
| | | | | | | Total | $669,639.00 | |

Notes:
PO Governed by Dutchie Branded - ELO Supplement 12-15-21 Clean Final Fully Executed

Invoices to be sent to:     ap@Dutchie.com

# EXHIBIT F

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373



**Dutchie, LLC**

2728 NW Potts Ct, Ste 100 Bend, OR 97703

| PO Number | DUTCHIE 06162022 |
|---|---|
| Purchase Date | 6/16/2022 |
| Payment Terms | N60 from customer shipment |
| Inco Terms | DAP - Customer Location |
| Ship To Location | ScanSource<br>8650 Commerce Drive<br>Suite 100<br>Southaven, MS 38671 |
| Delivery Instructions | Per individual call off schedule |

Seller:

Address:

Scan Source Inc
8650 Commerce Dr,
Southaven, MS 38671

| Line | Manufacturer | Part Number | Part Description | Product | Unit Price | QTY | Extended Price | Delivery Date to ScanSource |
|---|---|---|---|---|---|---|---|---|
| 1 | ELO | ELO-E375184 | Terminal - PRD-20174 V10 | Sporting | $651.04 | 8,000 | $5,208,320.00 | 8000 units - Jan 9, 2023 |
| 2 | ELO | ELO-E466379 | CFD - PRD-20194 V5 | Declan | $300.00 | 8,000 | $2,400,000.00 | 8000 units - Jan 9, 2023 |

Total     $7,608,320.00

Sales Tax

Total     $7,608,320.00

**Notes:**

Delivery date represents date product arrives at ScanSource warehouse via ocean shipment

Ref Elo Purchasing Terms; Unit price reflects ocean shipment

6/23/2022 v2: Price updated to reflect price paid to ScanSource ($651.04/unit) instead of price to Elo ($625/unit)

Invoices to be sent to:          ap@Dutchie.com

ELECTRONICALLY FILED - 2023 Jun 30 11:07 AM - GREENVILLE - COMMON PLEAS - CASE#2023CP2303373